APPEAL NO. 25-514

# UNITED STATES COURT OF APPEALS FOR SECOND CIRCUIT

MELINDA ANTONUCCI, CASEY MATHIEU,
*Plaintiffs-Appellants,*

v.

CHRISTOPHER WINTERS, in his personal and official capacity as
Commissioner of the Vermont Department for Children and Families, ARYKA
RADKE, in her personal and official capacity as Deputy Commissioner, Vermont
Department for Children and Families, Family Services Division, STACEY
EDMUNDS, in her personal and official capacity as Director, Residential
Licensing & Special Investigations, Vermont Department for Children and
Families, PAULA CATHERINE, in her personal and official capacity as a
Licensing Officer, Residential Licensing & Special Investigations, Vermont
Department for Children and Families,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Vermont

## APPELLANTS' OPENING BRIEF

Josh Dixon
Center for American Liberty
PO Box 200942
Pittsburgh, PA 15251-0942
(703) 687-6212
jdixon@libertycenter.org

Robert Kaplan
Kaplan and Kaplan
95 St. Paul Street Ste. 405
(802) 651-0013
rkaplan@kaplanlawvt.com

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Appellants are individuals.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ..................................................... 5

STATEMENT OF THE ISSUES ........................................................... 6

STATEMENT OF THE CASE ................................................................ 6

    I.    FACTUAL BACKGROUND ......................................................... 7

        A.    The Controversy over "Gender Affirming Care" ................. 7

        B.    Vermont's Foster Care System ............................................. 9

        C.    Melinda and Casey ............................................................. 15

        D.    The Department Begins Revocation Proceedings ............... 17

    II.  PROCEDURAL HISTORY ......................................................... 19

SUMMARY OF ARGUMENT ............................................................. 20

STANDARD OF REVIEW ................................................................... 24

ARGUMENT ....................................................................................... 24

    I.    THE DISTRICT COURT ERRED IN CONCLUDING
        APPELLANTS ARE UNLIKELY TO SUCCEED ON THE
        MERITS ....................................................................................... 24

        A.    Appellants are likely to succeed on their claim that the
            Guidelines violate the Free Exercise Clause. .................... 25

            1.    The Guidelines are not generally applicable. ................. 25

                a.    The Guidelines are a mechanism for individualized
                    considerations and exemptions. .................................. 26

                b.    The Guidelines allow comparable secular conduct ................... 30

            2.    The Guidelines are not neutral. ....................................... 34

3. The Guidelines impose an unconstitutional condition on the exercise of religion................................................... 38

B. Appellants are likely to succeed on their claim that the Guidelines violate the Speech Clause. ............................... 38

1. The Guidelines impermissibly seek to compel speech and expression............................................................... 39

2. The Guidelines impermissibly discriminate based on viewpoint. ....................................................................... 45

C. The Department Cannot Satisfy Any Level of Heightened Scrutiny................................................................................. 47

1. The Guidelines fail strict scrutiny ................................... 47

a. The Guidelines do not further a compelling purpose ................. 48

b. The Guidelines are not the least restrictive means. ................... 50

2. The Guidelines fail intermediate scrutiny ....................... 53

II. APPELLANTS SATISFY THE REMAINING INJUNCTION FACTORS ............................................................................... 54

CONCLUSION ..................................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023) ................................................................ 39, 40, 41

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ..................................................................39

*Agudath Israel of Am. v. Cuomo*,
   983 F.3d 620 (2d Cir. 2020)............................................. 24, 47, 49, 55

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
   651 F.3d 218 (2d Cir. 2011).........................................................39

*Bates v. Pakseresht*,
   No. 2:23-CV-00474-AN,
   2023 WL 7546002 (D. Or. Nov. 14, 2023)................................... 43, 46

*Blais v. Hunter*,
   493 F. Supp. 3d 984 (E.D. Wash. 2020) ........................ 27, 35, 36, 37, 38, 50, 51

*Brown v. Entm't Merchs. Ass'n*,
   564 U.S. 786 (2011)....................................................................49

*Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*,
   763 F.3d 183 (2d Cir. 2014)................................................. 31, 35, 37

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
   868 F.3d 104 (2d Cir. 2017).........................................................47

*Church of American Knights of the Ku Klux Klan v. Kerik*,
   356 F.3d 197 (2d Cir. 2004).........................................................45

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ............................... 25, 30, 31, 34, 35, 36, 37, 52

*City of Ladue v. Gilleo*,
   512 U.S. 43 (1994) .....................................................................52

iv

*Darren Patterson Christian Acad. v. Roy*,
No. 123CV01557DDDSTV,
2023 WL 7270874 (D. Colo. Oct. 20, 2023).......................................41

*Dorman v. Satti*,
862 F.2d 432 (2d Cir. 1988)................................................................41

*Elrod v. Burns*,
427 U.S. 347 (1976) ..........................................................................53

*Evergreen Ass'n, Inc. v. City of New York*,
740 F.3d 233 (2d Cir. 2014)........................................................ 44, 47

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) .............................................................27

*Fulton v. City of Phila.*,
593 U.S. 522 (2021) ....................................... 26, 27, 29, 30, 31, 33, 49

*IMS Health Inc. v. Sorrell*,
564 U.S. 552 (2011)..................................................................... 45, 53

*JLM Couture, Inc. v. Gutman*,
24 F.4th 785 (2d Cir. 2022)...............................................................24

*Joelner v. Vill. of Wash. Park*,
378 F.3d 613 (7th Cir. 2004)..............................................................56

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ..........................................................................40

*Matal v. Tam*,
582 U.S. 218 (2017) ..................................................................... 45, 46

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021)..............................................................41

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
460 U.S. 575 (1983) ..........................................................................40

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018) ..................................................................... 53, 54

*New Hope Fam. Servs., Inc. v. Poole*,
  966 F.3d 145 (2d Cir. 2020)................................................... 34, 35, 39, 40, 42, 44

*Oneida Nation of N.Y. v. Cuomo*,
  645 F.3d 154 (2d Cir. 2011) ...............................................................................24

*OPAWL v. Yost*,
  118 F.4th 770 (6th Cir. 2024)..............................................................................49

*SAM Party of New York v. Kosinski*,
  987 F.3d 267 (2d Cir. 2021)................................................................................55

*Saxe v. State Coll. Area Sch. Dist.*,
  240 F.3d 200 (3d Cir. 2001).................................................................................41

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ................................................................................... 25, 27

*Smith v. Org. of Foster Families for Equal. & Reform*,
  431 U.S. 816 (1977) ............................................................................................55

*Tandon v. Newsom*,
  593 U.S. 61 (2021) ...................................................................................... 31, 34

*Tellock v. Davis*,
  84 F. App'x 109 (2d Cir. 2003).............................................................................55

*Texas v. Johnson*,
  491 U.S. 397 (1989) ............................................................................................42

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ............................................................................................38

*United States v. Alvarez*,
  567 U.S. 709 (2012) ............................................................................................48

*United States v. O'Brien*,
  391 U.S. 367 (1968) ............................................................................................54

*United States v. United Foods, Inc.*,
  533 U.S. 405 (2001) ............................................................................................39

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ................................................................39

*Wandering Dago, Inc. v. Destito*,
  879 F.3d 20 (2d Cir. 2018) .....................................................46

*We the Patriots USA, Inc. v. Hochul*,
  17 F.4th 266 (2d Cir.),
  *opinion clarified*, 17 F.4th 368 (2d Cir. 2021) .................. 26, 27, 28, 29

*White River Amusement Pub, Inc. v. Town of Hartford*,
  481 F.3d 163 (2d Cir. 2007) .......................................... 42, 53

*Williams-Yulee v. Fla. Bar*,
  575 U.S. 433 (2015) ................................................................50

*Wollschlaeger v. Governor, Fla.*,
  848 F.3d 1293 (11th Cir. 2017) ..........................................41

**Statutes**

33 V.S.A. § 4905 ...........................................................................9

**Other Authorities**

*Burke v. Walsh*,
  3:23-cv-11798,
  Order Denying Motion to Dismiss (ECF 85) (D. Mass. June 5, 2024)..............27

*Department of Health and Human Services: Treatment for Pediatric Gender
  Dysphoria: Review of Evidence and Best Practices* (May 1, 2025) .....................8

*GOV.UK Press Release: Ban on puberty blockers to be made indefinite on experts'
  advice* (Dec. 11, 2024) ..........................................................................9

## **INTRODUCTION**

Appellants Melinda Antonucci and her husband Casey Mathieu are loving parents of three children. They are Christians, and motivated by their religious beliefs, they sought to become a licensed foster family in Vermont.

Vermont has a serious shortage of foster families. The Vermont Department for Children and Families welcomed Appellants' application, found that they had a loving home—one that was suitable for fostering children under its licensing Guidelines—and gave them a license. But when the Department found out that Appellants opposed providing "gender affirming care" to minors, it began license revocation proceedings against them. This was unconstitutional, and the district court erred in denying Appellants' motion to preliminarily enjoin the Department's efforts to terminate their license while this litigation is pending.

"Gender affirming care" is a type of healthcare treatment for individuals who have gender dysphoria and related conditions. It is based on the theory that transgender-identifying individuals' gender-related psychological distress will improve if their transgender identity is "affirmed," both socially and medically, through a gender transition. Specifically, social transitioning is a form of psychological treatment that primarily involves calling individuals by their preferred names and pronouns associated with their transgender identity. And medical transitioning involves medical efforts—namely, puberty blockers, cross-sex

hormones, and sex-reassignment surgeries—designed to make individuals' bodies look as if they were a member of the opposite sex.

The medical community is engaged in a robust debate regarding the safety and efficacy of these forms of care for minors. Yet despite this debate and ongoing concerns that "gender affirming care" does more harm than good in minors, the Department forces foster parents to profess their agreement to "gender affirming care" as a condition for obtaining a license, before any transgender-identifying child is placed in their home and regardless of whether they ever intend to foster a transgender-identifying child.

Informed by their religious beliefs, Appellants oppose participating in the social transition and facilitating the medical transition of children in their care. When Melinda posted about a similar issue on Facebook, the Department learned about the post and began asking Appellants about their views. In those conversations, Appellants objected to participating in the social transition of a hypothetical foster child by calling the child by "they/them" pronouns and to being required to speak to their five-year-old son about "they/them" pronouns. In addition, Appellants objected to facilitating the medical transition of a hypothetical transgender identifying foster child by, for example, driving the child to a doctor's office to receive a mastectomy. Based on these objections, the Department began revocation proceedings against

Appellants' license, despite making no finding that their home had become unsuitable for foster children.

Appellants harbor no discriminatory animus against transgender-identifying children, and they are happy to foster a transgender identifying-child. They object only to participating in the social transition and facilitating the medical transition of children on the terms demanded by the Department. But because these objections violate the Guidelines, the Department deemed Appellants unworthy of their license.

The Guidelines violate Appellants' First Amendment rights in three ways. First, the Guidelines impermissibly burden Appellants' religious exercise. Appellants have religious objections to participating in the social transition and facilitating the medical transition of children, and the Guidelines burden those religious beliefs.

Second, the Guidelines impermissibly seek to compel Appellants to speak. By requiring Appellants to commit to participating in the social transition and facilitating the medical transition of a hypothetical foster child, the Guidelines seek to compel foster families to engage in speech and expression they disagree with and punish those who do not adhere to the state's ideological purity test.

Third, the Guidelines impermissibly discriminate based on viewpoint. In addition to compelling controversial expression, the Guidelines also prohibit Appellants from speaking their minds on matters related to gender identity.

3

The Department does not have compelling reasons for imposing these restrictions on foster families. While ensuring the well-being of foster children is assuredly a compelling goal in the abstract, the Department has not shown that the Guidelines' wholesale embrace of "gender affirming care" promotes foster children's well-being. Moreover, the Guidelines undermine the well-being of foster children because they preclude loving parents like Appellants from participating in the program—despite Vermont's ongoing foster-care crisis—based on hypothetical concerns about a foster child's use of "they/them" pronouns and desire to undergo a medical transition.

Moreover, the Guidelines are neither narrowly tailored nor the least restrictive means of accomplishing the Department's putative goals. If the Department believes that only families who are willing to participate in the social transition and facilitate the medical transition of transgender-identifying children are worthy of a license, it could simply allow Appellants to foster only non-transgender-identifying children. Indeed, this is outcome would be particularly appropriate here: Appellants want to foster a child who is in the same age range as their five-year-old son, and the number of children in that age range who identify as transgender is vanishingly small. And in the unlikely event a child placed in Appellants' home later came to have a transgender identity and wanted to go by "they/them" pronouns or undergo a medical

4

transition, the Department could find another placement for that child, as it does in myriad other situations where a placement does not work out for whatever reason.

To be clear, Appellants do not seek to compel the Department to allow them to foster children on their terms. If the Department insists that foster parents must participate in the social transition and facilitate the medical transition of children in their care, Appellants accept that decision even though they disagree with it. But if that is the Department's position, to comply with the First Amendment it must allow Appellants to (1) opt-out of fostering transgender-identifying children and (2) seek another placement for a child who comes to have a transgender identity while in their care.

Appellants have made a strong showing that they are likely to succeed on the merits. Moreover, the other preliminary injunction factors tilt in Appellants' favor. Accordingly, the Court should REVERSE the district court's denial of Appellants' Motion for Preliminary Injunction and REMAND with instructions for the district court to preliminarily enjoin the Department's revocation of their license during the pendency of this proceeding.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this § 1983 action under 28 U.S.C. §§ 1331 and 1343(3). The district court denied Appellants' Motion for Preliminary Injunction on February 20, 2025. JA367–97. Appellants timely filed their notice of

appeal on March 4, 2025. JA398–99. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.    Are Appellants likely to succeed on the merits of their claim that the Guidelines violate the Free Exercise Clause of the First Amendment?

2.    Are Appellants likely to succeed on the merits of their claim that the Guidelines violate the Speech Clause of the First Amendment?

3.    Do the other preliminary injunction factors tilt in Appellants' favor?

## STATEMENT OF THE CASE

On July 17, 2024, Appellants filed this § 1983 action in the Vermont district court against various employees of the Vermont Department of Children and Families (collectively, the "Department") seeking primarily prospective relief against certain of the Department's foster care licensing provisions. JA10–40. That same day, Appellants filed a Motion for Preliminary Injunction seeking to enjoin the Department from revoking their foster care license and otherwise excluding them from the Department's foster-care program. JA292–93.

On February 20, 2025, the district court—the Honorable William K. Sessions, III, presiding—issued a memorandum opinion denying the Motion. JA367–97. That decision, which is the subject of this appeal, is available on Westlaw. *See Antonucci v. Winters*, No. 2:24-CV-783, 2025 WL 569832 (D. Vt. Feb. 20, 2025).

## I.    FACTUAL BACKGROUND

### A.    The Controversy over "Gender Affirming Care"

"Gender affirming care" describes a treatment paradigm for transgender-identifying individuals who suffer from gender dysphoria and other related conditions. JA15. As it pertains to minors, this model holds that minors' assertion of a transgender identity should be accepted as decisive and permanent and that "affirming" that identity is the best way to alleviate any accompanying psychological distress. JA15–16. This model promotes psychological interventions in minors such as social transitioning—*i.e.*, allowing transgender minors to use a different name, pronouns, dress, hairstyle, *etc.*, associated with their transgender identity. *Id.*; *see also* JA109 (describing social transitioning). It also promotes medical interventions in minors, such as puberty blockers, cross-sex hormones, and sex-reassignment surgeries, like mastectomies and genital removal surgery. JA 16–17.

The medical community is engaged in an intense debate regarding the safety and efficacy of "gender affirming care" in minors. JA28. In April 2024, the National Health Service in the United Kingdom published a years-long study overseen by Dr. Hilary Cass into the issue ("*The Cass Review*").[1] *The Cass Review* concluded that

---

[1] Due to the size of *The Cass Review*, the Joint Appendix contains only those pages that the parties cite and anticipate that they will cite in their briefing. The entire

there is very little high-quality evidence demonstrating that social or medical transitions are effective in minors. JA87–89, 128. Moreover, *The Cass Review* noted that social and medical transitions have serious risks. Social transitioning, for example, "may change the trajectory of gender identity development" in minors, making it more likely that a child's transgender identity will persist into adulthood. JA115. For these reasons, not every child who asks to be socially transitioned should be. *Id*.; *see also* JA16. Instead, a "cautious approach" is warranted, particularly in younger minors who are less likely to understand their own feelings about their gender identity. JA 115; *see also* JA 15–16. And medical transitions have even more serious risks, including the possibility of bone weakness, decreased sexual response, and infertility, just to name a few. JA123; *see also* JA17.[2]

_____

document is available in the record below as ECF 1-4.

[2] On May 1, 2025, the day before the due date of this brief, the United States Department of Health and Human Services released a report reviewing the evidence and best practices in connection with "gender affirming care" in minors. *See Department of Health and Human Services: Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (May 1, 2025) (the "DHHS Report"), available online at https://perma.cc/XN3W-BK8W. While the undersigned has not yet had the opportunity to conduct a thorough evaluation of the DHHS Report, upon first review it appears to be largely consistent with *The Cass Review* on the points at issue here. Appellants reserve the right to seek supplementation of the record to include the DHHS Report should they deem that course of action appropriate after counsel has had the opportunity to conduct a more thorough review of the document.

In response to these concerns, the United Kingdom has banned the use of puberty blockers for minors in connection with "gender affirming care." JA18.[3] Here at home, approximately twelve states have passed laws requiring schools to obtain parental consent or provide parental notice before socially transitioning minors at school, and approximately twenty-five states have enacted laws that ban or restrict "gender affirming" medical treatment for minors. JA17. Vermont has no such laws. *Id.*

## B.    Vermont's Foster Care System

In Vermont, families must obtain a license from the state to care for children in foster care on a long-term basis. JA19. The Department regulates licensing. *See, e.g.*, 33 V.S.A. § 4905. The Residential Licensing and Special Investigations unit (the "RLSI"), housed within the Department's Family Services Division, is the Department's licensing arm. JA13, 19.

Vermont has a serious shortage of licensed foster families. JA18. Many children in the state's custody wait weeks before a home becomes available, and some never find a home before leaving the state's custody. *Id.* Because of the

---

[3] At the time Appellants filed their complaint, that ban was temporary. JA at 18. It has since become permanent. *See GOV.UK Press Release: Ban on puberty blockers to be made indefinite on experts' advice* (Dec. 11, 2024), available online at https://perma.cc/XX42-E9BZ.

shortage, the state has even been forced to house children in hospital emergency rooms and police departments on a temporary basis. JA138.

Licensing is governed by a patchwork of statutes, regulations, rules, and Department policies (collectively, the "Guidelines"). JA19.[4] The process of obtaining a license is individualized, focusing on the unique circumstances of each family seeking a license. JA295. Families must apply, undergo a background investigation, be interviewed by RLSI personnel, and allow RLSI personnel to visit their home to ensure it suitable for foster children. *Id.*; *see also* JA19, 215–231.

The Licensing Rules for Foster Homes in Vermont (the "Rules") give the Guidelines their overarching structure. JA188–213. The Rules provide substantial discretion to the Department to determine whether to issue or revoke licenses. Under Rules 200.1, 202, 203, and 307, for example, the Department may deny or revoke a license if the applicant or licensee:

- Does not exhibit "[h]ealthy patterns of social and interpersonal relationships";
- Lacks "[s]ound judgment";
- Is unable to demonstrate "[s]table emotional adjustment";
- Does not have "[r]espect for the worth of all individuals";
- Is not an "appropriate model for children";
- Has "emotional problems" that "would have an adverse effect on the .

---

[4] The district court referred to the Guidelines as the "DCF's Rules and Policies." JA369. Appellants believe that the term "Guidelines" more accurately reflects the discretionary nature of the provisions at issue.

. . well-being of foster children"; or

- Does not "provide constructive, positive family living experiences for foster children."

JA197–99. Moreover, Rule 35 provides the Department the sole discretion to grant applicants or licensees a "variance" from almost every other Rule "upon [the Department's] determination that the applicant or licensee will otherwise meet the goal of the rule." JA193. The only Rules Rule 35 does not apply to are Rules 200, 201, and 315. *Id.*

Once the Department issues a license, foster families have substantial latitude to accept or reject any placement. In general, the Department sends email blasts to licensed foster families notifying them of new placements, and foster families who want to foster the child respond. JA25–26. Foster families generally "HAVE THE RIGHT TO SAY NO" to any placement, JA151, which they can do by simply not responding to the email blast or otherwise declining a specific placement offered to them by the Department. *See, e.g.*, JA150. The Department even assures foster parents that they should not "feel pressured into situations that make [them] uncomfortable or [they] feel will not work." JA151. Moreover, if a foster family accepts a placement but later realizes the child is a "bad fit" with their family—for whatever reason—the family generally may generally terminate the placement. JA361–62.

While foster families generally may decline or terminate a placement for any reason, Rule 200 provides that foster families are prohibited from discriminating "against a foster child based on race, religion, color, national origin, sex, sexual orientation, gender identity, age, or disability." JA197. But Rule 200 is not absolute. For one thing, the Guidelines elsewhere provide that foster families have the discretion to decide "the age, gender, and special needs of children [they] will accept." JA150; *see also* JA148 (similar). Indeed, the Guidelines advise families that they should "wait[] for a child who is a good match for [their] family" based on their preferences regarding age, gender, or special needs. *Id.*

Moreover, Rule 200.1 contains an express exception from Rule 200's anti-discrimination provision for foster parents with an "inability to care for children of a certain age or children with special needs." JA197. While Rule 200.1 does not define either "inability to care" or "special needs," the Department has candidly admitted that a foster family's "inability to care" for a child includes situations in which the care would require the foster family either (1) to "dedicate a significant amount of time" or (2) to expend a significant amount of money, both in the Department's sole judgment. JA310–11. A foster family would be required to dedicate a significant amount of time if, for example, the "level of care" required for a child "exceeds the norm." JA310. And a foster family would be required to expend a significant amount of money if, for example, the foster family lived in one-

12

bedroom home and would need to move or add a bedroom to their home to comply with the Guidelines' requirement (Rule 418) that foster children over two years old may not sleep in the same bedroom as the foster parents. JA310–11; *see also* JA207.

Further, while Rule 200.1 is not explicit on this point, it also necessarily allows foster families to make placement decisions based on the child's sex in certain situations. Specifically, Rule 419 provides that "[n]o child over five years of age shall sleep in the same room with a child of the opposite sex when either child is a foster child." JA207; *see also* JA310. Thus, a foster family that lives in a two-bedroom house with a six-year-old son, for example, is not required to move or add a second bedroom to their home. JA207. Instead, the family may refuse placement of girls. In fact, unless the Department grants a Rule 35 variance from Rule 419, the family *must* refuse placement of girls. Moreover, because Rule 419 prohibits children of the opposite "sex" from sleeping in the same room, *id.*, that Rule would also allow—indeed, *require*—that same foster family to refuse placement of a female foster child who had a male gender identity, again unless a Rule 35 variance was granted.

In addition to the Rules, the Guidelines also include Policy 76, entitled "Supporting and Affirming LGBTQ Children & Youth," which applies to children who identify as LGBTQ. JA176–86. As relevant here, Policy 76 provides that "LGBTQ [foster] children . . . will be placed in an LGBTQ affirming . . . placement."

JA181. In addition, foster families must "affirm" the transgender identity of children in their care. JA178. This includes using children's "preferred names" and "pronouns," allowing children to wear "gender affirming hairstyles, clothing, and accessories," and otherwise "[s]upport[ing]" children's gender transition "even if it feels uncomfortable." JA184. Foster families must keep a foster child's transgender identity "confidential" if the child "comes out" to them, and they may "not attempt to persuade [the child] to reject or modify their sexual orientation, gender identity, or gender expression." JA178, 180.[5]

Finally, various Rules govern foster families' obligations to facilitate the provision of healthcare treatment to foster children. Rule 301, for example, provides that "[f]oster parents shall meet the physical, emotional, developmental and educational needs of each foster child, in accordance with the child's case plan." JA199. Rule 307 provides that "[f]oster parents shall provide constructive, positive family living experiences for foster children." *Id.* And Rule 329 provides that "[f]oster parents shall cooperate . . . in securing routine and emergency medical and mental health care for foster children." JA202.

---

[5] While the text of Policy 76 applies only to Department employees, the Department interprets Policy 76 to apply to foster families as well. JA21.

### C.     Melinda and Casey

Appellants are loving parents who have been blessed with a happy and stable home. JA21. They have three children—a nineteen-year-old son, a sixteen-year-old daughter, and a five-year-old son. *Id.* Appellants are Christians, and their religious beliefs guide them in all they do, including motivating them to become foster parents. *Id.* Appellants believe that God creates humans to be either male or female and that it is immoral for adults to facilitate a young child's transition to live as a member of the opposite sex. JA30–31.

In February 2023, Appellants applied to the Department for a foster-care license. JA22. On the application, they were required to indicate whether they were willing to foster an "LGBTQ" child. *Id.*; *see also* JA223. Appellants indicated that they were. JA22. The Department employee who conducted Appellants' first home inspection also asked them if they were willing to foster an LGBTQ child. JA22. Melinda informed the employee that she and Casey had some hesitation with fostering a transgender-identifying child. *Id.* This hesitation was not due to animus against transgender identifying children but rather due to Appellants' perception— correct, it turns out—that the Department would require them to participate in the social transition and facilitate the medical transition of a child in their care, practices they objected to. *Id.* The Department employee advised Appellants to avoid

15

expressing hesitation about fostering a transgender-identifying child during the next home inspection. *Id.*

On October 19, 2023, a different licensing employee from the Department, Paula Catherine, contacted Appellants to schedule the second home inspection. *Id.*; *see also* JA243. Ms. Catherine asked Appellants to complete a supplemental training module. JA23. This supplemental training module—which contained presentations entitled "Welcome to LGBTQ+ 101: Caring for LGBTQ Children and Youth [FY22 – Present]" and "Supporting Youth"—taught foster parents to affirm a child's transgender identity. *Id.*; *see also* JA245–60. Ms. Catherine indicated that this supplemental training was necessary given the Department's perception that Appellants were hesitant to foster a transgender-identifying child. JA23. Melinda expressed reservations about being required to participate in "gender affirming care," particularly considering Appellants wanted to foster a younger child close to their five-year-old son's age. *Id.* Ms. Catherine stated that children are starting to question their gender at very young ages, and that Appellants must be mindful that this could happen with a foster child who was placed in their care. *Id.*

In January 2024, the Department approved Appellants' application and issued them a license. *Id.* The following month, they fostered an eight-year-old boy. *Id.* After a couple of weeks, Appellants realized the situation was a "bad fit" for their

family, and they asked the Department to find an alternative placement. JA361–62. Based on that request, the Department ended the placement. *Id.*

**D.  The Department Begins Revocation Proceedings**

On February 19, 2024, Melinda posted on her personal Facebook page a link to a parental rights petition in a local school district. JA23; *see also* JA262. The petition called on the school district to inform parents prior to facilitating their child's social transition to a new gender identity at school. JA24; *see also* JA262. Melinda encouraged others to sign the petition. JA262.

On April 1, 2024, Ms. Catherine contacted Appellants about Melinda's support for the petition. JA24; *see also* JA283. Ms. Catherine interrogated Appellants about their beliefs on transgender-identifying children, asking questions about their willingness to use children's preferred names and "they/them" pronouns and whether they would be willing to require their five-year-old son to do the same. JA24. Ms. Catherine ultimately demanded that Appellants commit to fostering transgender-identifying children under the terms required by the Department—that is, by affirming their transgender identity through social and medical transition, including referring to such a child by "they/them" pronouns and having their son do the same. *Id.*

Appellants were taken aback. After all, Appellants wanted to foster children in the age range of their five-year-old son, and almost no children in that age range

have a transgender identity. JA23–24, 67. Moreover, only about 1.4% of teenagers under the age of eighteen identify as transgender, JA41, and, plainly, even fewer seek to go by "they/them" pronouns or undergo a medical transition. And while Appellants harbor no discriminatory animus toward transgender-identifying children, would welcome a transgender-identifying foster child into their home, and would provide the child emotional support and facilitate the provision of *other* types of care—such as psychotherapy to treat gender dysphoria or related conditions— they are unable to participate in the social transition of such children through the use of "they/them" pronouns or facilitate their medical transition due to their religious beliefs. JA32–33; *see also* JA22, 362. Accordingly, Appellants said they were unwilling foster transgender-identifying children on the terms demanded by the Department. JA24.[6]

On April 4, 2024, Ms. Catherine informed Melinda that "since you will not . . . discuss they/them pronouns with your child, then [the Department does not] know how [it] can move forward with fostering." JA25; *see also* JA281. Ms. Catherine

---

[6] While not relevant here, Appellants would be willing to participate in the social transition of a transgender-identifying minor in late adolescence by using a new name and new "he/him" or "she/her" pronouns. Appellants object, however, to calling younger minors by a new name and new "he/him" or "she/her" pronouns and to calling anyone by "they/them" pronouns or requiring their five-year-old son do the same.

18

informed Melinda that she could "close [her] foster care license or [the Department] will need to formally deny [the] license." JA25; *see also* JA281.

On May 29, 2024, Appellants, through counsel, sent the Department a letter explaining their objections to the Guidelines and requesting clarification regarding the status of their license. JA26; *see also* JA271–79. On June 14, 2024, the Department responded to the letter, but it did not address Appellants' concerns. JA285–86.

On July 1, 2024, Appellants received a Notice of Decision that the RLSI was recommending that their license be revoked if they did not file an appeal with the Human Services Board by August 1, 2024. JA26; *see also* JA288–91. The Notice of Decision said the reason for the recommendation was Appellants' violation of Rule 200 because of their unwillingness to speak with their son about "they/them" pronouns and their failure to commit to participating in the social transition and facilitating the medical transition of a hypothetical foster child on the terms demanded by the Department. JA288–91.

## II.    PROCEDURAL HISTORY

Appellants filed their Complaint on July 17, 2024, after they received the Notice of Decision. JA10–40. That same day, Appellants filed their Motion for Preliminary Injunction. JA292–93. On February 20, 2025, the district court issued a

memorandum opinion denying the Motion for Preliminary Injunction. JA367–97. On March 4, 2025, Appellants filed a notice of appeal. JA398–99.

While Appellants originally appealed the Notice of Decision to the Human Services Board, the have since withdrawn that appeal. JA364–66. Accordingly, Appellants license has now been revoked. JA288–91.

## SUMMARY OF ARGUMENT

The district court erred in concluding the Guidelines comply with the First Amendment. The Guidelines violate Appellants' First Amendment rights in three ways.

First, the Guidelines impermissibly burden Appellants' religious exercise. Appellants have religious objections to participating in the social transition and facilitating the medical transition of children, and the Guidelines burden those religious beliefs.

Moreover, the Guidelines are not generally applicable. Both as a whole and on the specific facts here, the Guidelines create a system of discretionary provisions and exemptions that allow the Department to discriminate against religious exercise. In addition, the Guidelines are not generally applicable because they prohibit foster families from making religiously motivated placement and retention decisions while allowing foster families to make placement and retention decisions based on secular motivations that impact the Department's asserted interests in similar ways.

Specifically, because the Guidelines' anti-discrimination provision allows secularly motivated exemptions but not religiously motivated exemptions, the Guidelines are not generally applicable.

The Guidelines are also not neutral toward religion. Instead, based on their text, enactment history, and practical effect, the Guidelines reflect at least a subtle departure from neutrality towards religion.

Further, and for the same reasons the Guidelines are neither generally applicable nor neutral, they also impose an unconstitutional condition on religious exercise.

Second, the Guidelines impermissibly seek to compel Appellants to speak. By requiring Appellants to commit to participating in a hypothetical foster child's social transition—including but not limited to speaking with their five-year-old son about "they/them" pronouns—and to facilitating a hypothetical foster child's medical transition, the Guidelines seek to compel foster families to engage in speech and expression. The Department's assertion that it imposes these requirements out of concern for foster children's "safety" does not change this fact, and courts may not avoid the application of strict scrutiny by the mere expedient of invoking children's "safety." Instead, because the Guidelines compel speech and expression, they must survive the crucible of strict scrutiny or, at least, intermediate scrutiny.

Third, the Guidelines impermissibly discriminate based on viewpoint. In addition to compelling controversial expression, the Guidelines also prohibit Appellants from speaking their minds on matters related to gender identity. This, too, renders the Guidelines subject to strict scrutiny.

Strict scrutiny applies, and the Department has not satisfied its burden of demonstrating that it has compelling reasons for imposing these restrictions on foster families. While ensuring the well-being of foster children is a compelling goal in the abstract, the Department has not shown that the Guidelines' wholesale embrace of "gender affirming care" promotes foster children's well-being. To satisfy its burden, the Department is required to prove—and not just assert—that "gender affirming care" is safe and effective. The Department has not come close to making this showing. Moreover, the Guidelines undermine the well-being of foster children because they preclude loving parents like Appellants from participating in Vermont's foster-care program based on nothing more than hypothetical concerns about a foster child's use of "they/them" pronouns and desire to undergo a medical transition.

Moreover, the Guidelines are neither narrowly tailored nor the least restrictive means of accomplishing the Department's putative goals. If the Department insists that only families who are willing to participate in the social transition and facilitate the medical transition of transgender-identifying children are worthy of a license, it

22

could allow Appellants to foster only non-transgender-identifying children. Indeed, on the facts here, this is outcome would be particularly appropriate: Appellants want to foster a child who is in the same age range as their five-year-old son, and almost no children in that age range identify as transgender. And in the unlikely event a child placed in Appellants' home later came to have a transgender identity and wanted to go by "they/them" pronouns or undergo a medical transition, the Department could find another placement for that child, as it does in many other situations where a placement does not work out.

Even if intermediate scrutiny applied, the result would be the same. The Department has not shown that "gender affirming care" furthers an important government interest, and the Guidelines' restrictions on speech are not essential to the state's anti-discrimination purpose.

Finally, the district court also erred in weighing the other preliminary injunction factors. The district court's errors flowed from its erroneous conclusion that Appellants had not shown they were likely to succeed on the merits. Because Appellants have made that showing, the other preliminary injunction factors fall into place. Appellants are irreparably harmed by the loss of their First Amendment rights, and an injunction is in the public interest.

For these reasons, the Court should REVERSE the district court's denial of Appellants' Motion for Preliminary Injunction and REMAND with instructions for

the district court to preliminarily enjoin the Department's revocation of their license during the pendency of this proceeding.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for preliminary injunction for abuse of discretion. *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011). A district court abuses its discretion where its ruling is based on "a clearly erroneous assessment of the evidence" or "an erroneous view of the law." *Id.* The Court reviews "factual findings for clear error and conclusion of law de novo." *JLM Couture, Inc. v. Gutman*, 24 F.4th 785, 794 (2d Cir. 2022).

## ARGUMENT

To obtain preliminary injunctive relief against the state, the movant must show: (1) "a likelihood of success on the merits"; (2) that they will suffer "irreparable harm absent injunctive relief"; and (3) that the injunction is in the "public interest." *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (cleaned up). The district court committed legal error in concluding Appellants did not make these showings below.

## I. THE DISTRICT COURT ERRED IN CONCLUDING APPELLANTS ARE UNLIKELY TO SUCCEED ON THE MERITS

The district court committed legal error in concluding the Guidelines likely do not violate the First Amendment.

**A. Appellants are likely to succeed on their claim that the Guidelines violate the Free Exercise Clause.**

To maintain their license, the Department required Appellants to agree to participate in foster children's social transition—including speaking with their own five-year-old-son about "they/them" pronouns—and to facilitate the medical transition of foster children in their care. JA24–25. To comply, Appellants would have been required to violate their sincerely held religious beliefs. JA32–33. Accordingly, the Guidelines infringe Appellants' right to exercise their religion.

The state is prohibited from burdening religious exercise under laws and regulations that are not both "generally applicable" and "neutral" unless they satisfy strict scrutiny. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Here, there is no dispute that revoking Appellants' license burdens their religious exercise. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (holding that "forc[ing an individual] to choose between following the precepts of her religion" and participating in a government program burdens religious exercise). Moreover, the Guidelines are neither "generally applicable" nor "neutral." Further, the Guidelines impose an unconstitutional condition on Appellants' religious exercise. Thus, the Guidelines are subject to strict scrutiny.

1. <u>The Guidelines are not generally applicable.</u>

The "principle underlying the general applicability requirement" is that the government may not create a regulatory regime that allows it to "impose burdens

only on conduct motivated by religious belief." *Church of Lukumi*, 508 U.S. at 543. Laws can violate this principle in two ways. First, "[a] law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021). Second, "[a] law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534.

The district court concluded that the Guidelines are generally applicable because the "mere existence of an exemption procedure, absent any showing that secularly motivated conduct could be impermissibly favored over religiously motivated conduct, is not enough to render a law not generally applicable and subject to strict scrutiny." JA391 (quoting *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 288–89 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021)). While this is a correct recitation of the law in this Circuit, the district court misapplied that law here.

### a. The Guidelines are a mechanism for individualized considerations and exemptions.

The Guidelines are not generally applicable because they give broad discretion to the Department to deny or revoke licenses on almost any ground, which allows the Department to favor secular conduct over religiously motivated conduct. The Guidelines provide, for example, that the Department should consider whether

applicants or licensees: (1) lack "[s]ound judgment"; (2) do not have "[r]espect for the worth of all individuals"; or (3) are not an "appropriate model for children." JA197–98. These provisions give the Department almost unfettered discretion to deny or revoke licenses, the "mere existence" of which "is enough to render a policy not generally applicable." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023); *see also Blais v. Hunter*, 493 F. Supp. 3d 984, 998–99 (E.D. Wash. 2020) (holding Washington's foster-care regime not generally applicable because its "open ended regulations and policies" gave the government "broad discretion" to make "case-by-case" determinations); *Burke v. Walsh*, 3:23-cv-11798, Order Denying Motion to Dismiss (ECF 85), at *13–17 (D. Mass. June 5, 2024) (similar). *Accord Sherbert*, 374 U.S. at 400, 406 (subjecting statute with "good cause" standard to strict scrutiny).

In addition, the Guidelines are not generally applicable because Rule 35 creates a variance mechanism that also gives the Department broad discretion to deny or revoke licenses. That Rule authorizes the Department to "grant a variance" from almost all other Rules whenever it believes, in its sole discretion, that the "licensee will otherwise meet the goal of the rule" at issue. JA193. Because Rule 35 authorizes the Department "to grant exemptions based on the circumstances" underlying each individual situation in its "sole discretion," the Guidelines are not "generally applicable." *Fulton*, 593 U.S. at 534.

27

The district court's reliance on *We The Patriots*, JA389, was misplaced. There, the plaintiffs argued that a vaccine mandate's medical exemption rendered the mandate not generally applicable. 17 F.4th at 288–90. The Court disagreed because the mandate "afford[ed] no meaningful discretion" to the state but instead "provide[d] for an objectively defined category of people to whom [it did] not apply: employees who present a certification from a physician . . . attesting that they have a preexisting health condition." *Id.* at 289. Here, by contrast, the Guidelines do not create "objectively defined categories of people" whose licenses will be denied or revoked. Instead, they give broad discretion to the Department—through both their open-ended Rules and Rule 35's broad variance provision—to deny or revoke licenses. Thus, unlike the vaccine mandate in *We The Patriots*, the Guidelines "create[] the risk that administrators will use their discretion to exempt individuals from complying with the law for secular reasons, but not religious reasons." 17 F.4th at 288.

True, Rule 35 does not apply to Rule 200, which is the anti-discrimination rule the Department cited in revoking Appellants' license. JA193; *see also* JA288–91. But Appellants are challenging the Guidelines as a whole, not just Rule 200. In any event, Rule 200 is not applicable because Appellants do not assert the right to discriminate against transgender-identifying children. Indeed, they are ready, willing, and able to foster a transgender-identifying child. JA362. They are unable

to do so, however, consistent with their religious exercise if the Department is going to require them to commit to participating in the social transition and facilitating the medical transition of children in their care. *Id*. Thus, the reason for the Department's actions against Appellants was not discrimination in violation of Rule 200, but rather their failure to commit to providing certain, specific forms of healthcare treatment to foster children in their care.

Yet Rule 35 allows the Department to grant a variance to foster parents from the Rules governing the provision of healthcare treatment to foster children. Rule 301, for example, provides that "[f]oster parents shall meet the physical, emotional, developmental and educational needs of each foster child, in accordance with the child's case plan." JA199. And Rule 329 provides that "[f]oster parents shall cooperate . . . in securing routine and emergency medical and mental health care for foster children." JA202. Because Rule 35 allows the Department to grant a variance from these healthcare-related Rules in its discretion—a variance that it did not grant to Appellants—that Rule "invites the government to decide which reasons for not complying with the [Guidelines] are worthy of solicitude." *Fulton*, 593 U.S. at 537. Accordingly, the Guidelines are not generally applicable. *Id.*; *see also We The Patriots*, 17 F.4th at 288 (noting that a law lacks generally applicability when it allows "the State to favor . . . secular reasons . . . over religious reasons").

Moreover, Rule 200 itself contains an exemption for children with "special needs." JA148, 150, 197. But the Guidelines do not define what it means for a child to have "special needs," and the Department interprets that term broadly to refer to a child who "requires a level of care . . . that exceeds the norm for a typical child in foster care." JA310. Under this open-ended definition, the Department could consider a child who requests a social transition—which requires daily affirmation of their transgender identity—or a medical transition—which could require regular appointments with a doctor—to have "special needs." The fact that the Department could adopt this interpretation of "special needs" in its discretion—and thus exempt foster parents from Rule 200's prohibition of discrimination for secular reasons—also renders the Guidelines not generally applicable.

### b. The Guidelines allow comparable secular conduct.

The Guidelines are also not generally applicable because they prohibit religiously motivated conduct while allowing similar secularly motivated conduct. *Fulton*, 593 U.S. at 534. Specifically, the Guidelines allow exceptions from Rule 200 for various secular reasons, but they do not allow exceptions from Rule 200 for religious reasons. This renders the Guidelines not generally applicable.

The classic case involving a lack of general applicability under this theory is *Church of Lukumi*. There, a city prohibited animal sacrifice, which was a practice of the Santaria faith. 508 U.S. at 524–28. The city asserted that the prohibition was

30

necessary to protect public health, but the prohibition did not apply to hunters' or restaurants' disposal of animal carcasses, both of which presented a similar risk to public health as animal sacrifice. *Id.* at 544–45. Because the prohibition failed to "prohibit nonreligious conduct that endangered [public health] in a similar . . . degree" as religious conduct, this underinclusiveness rendered the prohibition not generally applicable. *Id.* at 543. So too here.

While Rule 200 generally prohibits foster families from discriminating against foster children based on certain protected characteristics, it allows foster families to base placement decisions on the child's "age, gender, and special needs" according to foster families' preference for what they believe might be a good "match" for their family. JA148, 150. In addition, Rule 200.1 both explicitly provides and implicitly acknowledges that foster families may base placement decisions on these protected characteristics in certain situations. JA197; *see also* JA310–11. Because the Guidelines do not also create an exemption from Rule 200 based on foster families' religious beliefs, the Guidelines impermissibly "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534; *see also Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (noting that laws are not generally applicable when "they treat *any* comparable secular activity more favorably than religious exercise" (emphasis in original)); *Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of*

*Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014) (concluding that law is not generally applicable if it "regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it").

The district court concluded that the Guidelines were generally applicable because Rule 200.1 "address[es] practical concerns, primarily related to space or family resources." JA392. But this conclusion ignores the fact that the Guidelines allow foster families to base their placement decisions on "age, gender, and special needs" according to what the family thinks would be a good "match." JA148, 150. This exemption renders the Guidelines not generally applicable.

Moreover, even if the only exemption from Rule 200 were set forth in Rule 200.1, the Guidelines are still not generally applicable. Contrary to the district court's suggestion, simply labeling Rule 200.1 as being based on "practical concerns" does not end the analysis. As noted, while Rule 200.1 does not define what "inability to care" for certain children means, the Department candidly admitted below that it includes situations in which caring for a child would require the family to (1) "dedicate a significant amount of time" or (2) expend a significant amount of money. JA310–11. Yet just like sacrificing a significant amount of time or spending a significant amount of money burdens foster families' secular interests, requiring foster families to violate their religious beliefs by participating in the social

transition or facilitating the medical transition of foster children burdens their exercise of religion.

Take Rule 419, for example, which allows foster families to refuse placement of children over five years old whose sex is different from their own child when their home is not big enough that the children can have separate bedrooms. JA207. That Rule is based on the Department's view of the proper privacy boundaries between children of different sexes and its judgment that it is too burdensome to require foster families to either move or modify their home as a condition for obtaining or maintaining a license. The Department is entitled to hold that view and make that judgment, of course, but because the Department allows foster families an exemption from Rule 200 based on those secular considerations, its failure to allow foster families an exemption from Rule 200 based on their religious views renders the Guidelines not generally applicable.

Further, the Guidelines' exemptions from Rule 200 "undermine[] the [Department's] asserted interests in a similar way" as allowing foster families to claim a religious exemption from Rule 200 would. *Fulton*, 593 U.S. at 534. The obvious purpose of Rule 200 is to prohibit invidious discrimination against foster children on certain protected bases. As noted, however, Appellants do not seek a license to discriminate against transgender-identifying children. Instead, they seek a determination that their religious objections to participating in the social transition

and facilitating the medical transition of such children do not constitute impermissible "discrimination" as that term is used in Rule 200. Because the Guidelines consider certain decisions based on age, sex, and special needs to be non-discriminatory for purposes of Rule, they treat comparable secular activity more favorably than religious exercise as "judged against the asserted government interest that justified the regulation." *Tandon*, 593 U.S. at 62. Accordingly, the Guidelines are not generally applicable.

In short, Appellants seek a comparable religious exemption from Rule 200 to the one that the Guidelines create for secular reasons; that is, not a free pass to engage in invidious discrimination, but a ruling that parents who are unable to care for transgender-identifying children under the Department's requirements because of their religious beliefs will not have their licenses denied or revoked for that reason. Because families may obtain and keep their licenses despite failing to accept or maintain certain children based on certain protected characteristics for secular reasons but not religious ones, the Guidelines are not generally applicable.

### 2. The Guidelines are not neutral.

The Free Exercise Clause prohibits more than just facial discrimination against religion. It also forbids even "subtle departures from neutrality" and laws that amount to the "covert suppression of . . . religious beliefs." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 163 (2d Cir. 2020) (quoting *Church of Lukumi*,

508 U.S. at 534, 546). In determining whether a regulation represents a "subtle departure from neutrality," the Court should evaluate whether the regulation: (1) uniquely burdens "religious objectors"; (2) "favors secular conduct"; and (3) bars "more religious conduct than is necessary to achieve [its] stated ends." *Blais*, 493 F. Supp. 3d at 995 (citing *Church of Lukumi*, 508 U.S. at 536–38). Appellants need only raise a "slight suspicion" of "animosity to religion" to meet this standard. *New Hope*, 966 F.3d at 161.

Here, based primarily on the "historical background" of the Guidelines, JA389, the district court concluded that they were not "a masked . . . attempt to deny applicants on religious grounds," JA391. This was error.

As explained, the Guidelines lack general applicability. The failure to meet the "[general applicability] requirement is a likely indication that the [neutrality requirement] has [also] not been satisfied." *Church of Lukumi*, 508 U.S. at 531. Because the district court concluded that the Guidelines were generally applicable, that error led it also to erroneously conclude the Guidelines were not neutral.

Moreover, while the "historical background" of the Guidelines is undoubtedly relevant to the question of neutrality, *New Hope*, 966 F.3d at 161, it is not dispositive, as the district court erroneously concluded. Rather, the Court must also "carefully consider the effect of the law in its real operation." *New Hope*, 966 F.3d at 163 (emphasis added); *see also Church of Lukumi*, 508 U.S. at 535 (noting that "the

effect of a law in its real operation is strong evidence of its object"); *Cent. Rabbinical Cong.*, 763 F.3d at 194 (similar). The district court erred by failing to conduct this analysis.

Taking account of the "effect" of the Guidelines, they are not neutral "in practice." *Blais*, 493 F. Supp. 3d at 996. The Guidelines in general—and Policy 76 in particular—reflect a sweeping effort to give special protections to foster children who identify as LGBTQ. That is a permissible state goal in the abstract. In doing so, however, Policy 76 implicitly targets religious foster families. Under Policy 76, foster families may not, for example, "impose" their "religious beliefs" on foster children, nor may they use their "religious beliefs to indicate [foster children] will be punished [by God] because of their identity." JA178, 185. This targeting of religious beliefs is strong evidence of non-neutrality. *Church of Lukumi*, 508 U.S. at 534 (noting that the "the choice of [religiously motivated] words" supports a conclusion of non-neutrality).

Moreover, Policy 76 was motivated at least in part due to a hostility to religious views. The Department's own evidence establishes that part of the impetus for Policy 76 was the prevalence of "religious beliefs that neither accept nor tolerate nonheterosexual identities or gender nonconformities." JA317. According to the Department, combating these religious beliefs "necessitates changing . . . the attitudes" of foster families and the "systems of oppression" they participate in. *Id.*

36

This is accomplished by prohibiting foster families from "attempt[ing] to persuade and LGBTQ individual to reject or modify their sexual orientation, gender identity, or gender expression." JA178. And foster families must "[s]upport children's identities even if it feels uncomfortable," take children to "LGBTQ organizations and events in the community," and connect children with "an LGBTQ adult role model." JA184. Notably, these requirements are directly contrary to the Guidelines' instructions elsewhere that foster parents should not "feel pressured into situations that make [them] uncomfortable." JA151. When it comes to religious views, however, Policy 76 seeks to "chang[e] . . . attitudes," JA317, by forcing foster families into "uncomfortable" situations, JA184. Thus, in "practical terms," these provisions prohibit behavior that is mostly attributable to religious views, which the Guidelines are hostile towards. *See Cent. Rabbinical*, 763 F.3d at 195-96.

This is true even if the Guidelines potentially burden non-religious beliefs as well. While there are valid secular reasons to oppose the Guidelines' requirements, as the court in *Blais* concluded, as a practical matter, "the only foster care applicants who might object to supporting certain issues LGBTQ+ children might face will likely do so on religious grounds." 493 F. Supp. 3d at 996. Accordingly, the Guidelines "favor . . . secular viewpoints over . . . religious viewpoints." *Id.*; *see also Church of Lukumi*, 508 U.S. at 536 (concluding ordinances were not neutral because their burden fell on "almost" no one but the disfavored religious group).

Further, the Guidelines "bar more religious conduct than necessary to achieve [their] ends." *Blais*, 493 F. Supp. 3d at 996. As relevant to social and medical transitioning, the Department could "address the issue at a later age," "rely on caseworkers to carry out medical decisions [Appellants] cannot support for religious reasons," or "change placements in the rare situation where [Appellants] might be unable . . . to carry out the Department's decisions with respect to a particular child." *Id.* at 997. Because the Guidelines foist these obligations on foster families, they bar more religious conduct than necessary. Accordingly, they are not neutral to religion.

3.     The Guidelines impose an unconstitutional condition on the exercise of religion.

The government may not deny "a generally available benefit solely on account of religious identity." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017). For the same reasons the Department's policies are neither generally applicable nor neutral they also deny Appellants a generally available benefit based on their religion. *Id.* at 462; *see also Blais*, 493 F. Supp. 3d at 999–1000 (holding that similar licensing rules impose unconstitutional condition). For this reason, too, the Guidelines are subject to strict scrutiny.

**B. Appellants are likely to succeed on their claim that the Guidelines violate the Speech Clause.**

The Guidelines violate Appellants' free speech rights in two ways. First, they impermissibly attempt to compel Appellants' speech and expression. Second, they

impermissibly discriminate against Appellants based on their viewpoint regarding "gender affirming care."

1. The Guidelines impermissibly seek to compel speech and expression.

The Guidelines' requirements that Appellants must agree to participate in foster children's social transition—including speaking with their five-year-old-son about "they/them" pronouns—and to facilitate foster children's medical transition impermissibly seek to compel Appellants' speech and expression.

The Free Speech Clause prohibits "the government from compelling individuals to express certain views." *United States v. United Foods, Inc.,* 533 U.S. 405, 410 (2001). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The government violates this command when it "compel[s] a person to speak [the government's] preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023); *see also New Hope*, 966 F.3d at 171 (reversing dismissal of free speech claim where regulation required Catholic adoption agency to recommend adoptions in violation of its religious views). The government compels a person to speak when it requires speech as a prerequisite for obtaining or maintaining a license. *New Hope*, 966 F.3d at 176; *see also All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.,*

651 F.3d 218, 234 (2d Cir. 2011) ("Compelling speech as a condition of receiving a government benefit cannot be squared with the First Amendment."), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,* 570 U.S. 205 (2013).

The district court concluded that the Guidelines regulated conduct and not speech. JA383–86. According to the court, the speech required by the Guidelines was merely "incidental to rules of conduct designed to promote healthy and affirming homes." JA386. This was error.

Non-discrimination policies regulate speech when they target the "communication of ideas" expressed by the speaker. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). "[W]hen government directly regulates speech by mandating that persons explicitly agree with government policy on a particular matter, it plainly violates the First Amendment." *New Hope*, 966 F.3d at 170 (cleaned up). This is true "even [for] regulations aimed at proper governmental concerns," because such regulations "can restrict unduly the exercise of rights protected by the First Amendment." *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592 (1983).

Applying these principles, the Policies regulate speech and expression. First, the Department's requirement that Appellants discuss "they/them" pronouns with their five-year-old son plainly compels speech and not conduct. "[O]ral utterances" that express ideas are "pure speech" under the Supreme Court's precedents. *303*

*Creative*, 600 U.S. at 587. As the Eleventh Circuit has colorfully put it, "[s]aying that restrictions on writing and speaking are merely incidental to speech is like saying that limitations on walking and running are merely incidental to ambulation." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017). Requiring Appellants to speak with their son about "they/them" pronouns compels their speech.

Second, and similarly, the Department's requirement that Appellants (and their son) use a foster child's preferred name and pronouns also compels speech and not conduct. *See Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021) (holding that use of pronouns is protected speech); *Darren Patterson Christian Acad. v. Roy*, No. 123CV01557DDDSTV, 2023 WL 7270874, at *17 (D. Colo. Oct. 20, 2023) (same). It does not matter that the Department frames this speech as violating Rule 200. "When laws against harassment attempt to regulate oral or written expression . . . [courts] cannot turn a blind eye to the First Amendment implications." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001); *see also 303 Creative*, 600 U.S. at 573 (explaining that anti-discrimination laws are not "immune from the demands of the Constitution"); *Dorman v. Satti*, 862 F.2d 432, 437 (2d Cir. 1988) (noting that prohibitions on "harassment" that encompass speech are "circumscribed by the first amendment").

Third, even if the Department's requirement that Appellants agree to facilitate the medical transition of a hypothetical transgender-identifying child is a regulation

of conduct, that conduct is inherently expressive. "As the Supreme Court has long recognized, . . . conduct can claim the protections of Free Speech where '[a]n intent to convey a particularized message [is] present, and . . . the likelihood [is] great that the message would be understood by those who viewed' or learned of the conduct." *New Hope*, 966 F.3d at 176 (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (holding flag burning is inherently expressive)); *see also White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 169 (2d Cir. 2007) (holding nude dancing is inherently expressive). Facilitating the medical transition of children is "sufficiently imbued with elements of communication" that it falls "within the scope of the First . . . Amendment[]." *Johnson*, 491 U.S. at 404.

*New Hope* is instructive. There, the state enacted a regulation prohibiting discrimination based on sexual orientation in adoption placements. 966 F.3d at 155. A Catholic adoption agency held the view that adoption should be limited to heterosexual couples, and it claimed that the regulation compelled it to speak by requiring it to approve adoptions by homosexual couples. *Id.* at 171. The state argued, among other things, that the regulation prohibited conduct because it restricted the agency's "refusal to provide adoption services to or place children with . . . same-sex couples." *Id.* at 176. The Court concluded that this conduct was protected by the First Amendment because it necessarily implied that the agency "approve[d] the placement" at issue. *Id.* at 177. Similarly, here, requiring Appellants

to facilitate medical transition of children in their care requires Appellants to engage in conduct that implies they "approve[]" of that form of treatment. *Id.*

The district court cited *Bates v. Pakseresht* in support of its conclusion that the Guidelines regulate conduct and not speech, JA385, but *Bates* says exactly the opposite. There, the court concluded the policy at issue did not *facially* compel speech because it did not require "applicants [to] agree to use a child's preferred pronouns." No. 2:23-CV-00474-AN, 2023 WL 7546002, at *16 (D. Or. Nov. 14, 2023). But the agency did require the plaintiff to "us[e] a child's preferred pronouns" *as applied*. *Id.* at *17. This as-applied requirement "focused on the *content* of plaintiff's message, not her *conduct*," thus subjecting the policy to strict scrutiny. *Id.* (emphases added); *see also id.* at *18. Accordingly, *Bates* supports the conclusion that the Guidelines regulate speech.

The district court's efforts to analogize the Guidelines' compelled speech and expression requirements to its conduct-based requirements—like the requirement that foster parents exhibit "healthy patterns of social and interpersonal relationships," JA384 (quoting Rule 201.1), for example—are also unavailing. Unlike pure speech and expressive conduct, engaging in healthy behaviors, without more, is obviously conduct. And as for the district court's hypothetical policy that prohibits foster parents from using "abusive language in the home," JA386, such a prohibition would regulate pure speech. While such a prohibition would almost

43

certainly survive strict scrutiny, the district court cannot avoid constitutional review by the mere expedient of announcing that such a rule is "incidental to the well-being of the foster child." *Id.* That sleight of hand does not give speech and expression the protection it deserves under the First Amendment.

Moreover, the district court's observation that the Guidelines "did not compel [Appellants] to . . . make any statements that disavowed [their] beliefs," JA385, is beside the point. Appellants "do not wish to speak to their five-year-old son about preferred names and pronouns." JA31. Appellants "disagree with calling younger transgender-identifying minors by their preferred names and pronouns associated with their transgender identity." JA30. And Appellants "disagree with the view that transgender-identifying minors should undergo . . . medical transition." *Id.* Yet under the Guidelines, Appellants are required to engage in all this speech and expression as a condition of obtaining and maintaining a license. This constitutes compelled speech. *Evergreen Ass'n, Inc. v. N.Y.C.*, 740 F.3d 233, 244 (2d Cir. 2014) ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." (citation omitted)); *see also New Hope*, 966 F.3d at 177 (similar).

The district court also tried to analogize this case to *Church of American Knights of the Ku Klux Klan v. Kerik*, JA384, but the analogy fails. In *Kerik*, this Court held that that while the act of wearing the Ku Klux Klan uniform was

44

"expressive," the act of also wearing a mask was not expressive because any message the mask conveyed was "redundant" to the Klan's traditional hood and robe. 356 F.3d 197, 206 (2d Cir. 2004). This holding plainly has no application here.

Despite this distinction, the district court concluded that, like the mask ban, the Guidelines permissibly further the Department's interests in the "safety" of LGBTQ youth because the Guidelines were "driven by research and feedback on the factors that improve outcomes for LGBTQ youth in foster care." JA384 (quoting *Kerik*, 356 F.3d at 209). But again, the district court may not avoid application of the First Amendment simply by declaring that the Guidelines were motivated by "safety" concerns. In *Kerik*, "safety" was a valid regulatory reason for the mask ban precisely because the Court had already concluded mask wearing was not expressive. 356 F.3d at 209. Here, by contrast, because speech and expression are involved, the Department's claim that the Guidelines advance the "safety" of foster children must be assessed according to strict scrutiny.

2.  The Guidelines impermissibly discriminate based on viewpoint.

"[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Matal v. Tam*, 582 U.S. 218, 234 (2017) (citation omitted). Viewpoint discrimination is particularly odious when done to compel conformity with the government's own prevailing orthodoxy. *See IMS Health Inc. v. Sorrell*, 564 U.S. 552, 566 (2011) (observing that

the government "may no more silence unwanted speech by burdening its utterance than by censoring its content"). If the government allows certain views to flourish while stifling dissenting opinions, it engages in viewpoint discrimination. This is no less true when the government makes a state license dependent on speech that conforms with the state's preferred ideology. *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 36 (2d Cir. 2018) (holding viewpoint compliance requirement is "an unconstitutional burden on First Amendment rights").

Here, the district court barely addressed Appellants' viewpoint discrimination claim, asserting only—without any analysis whatsoever—that the Guidelines' requirements were "not targeted at any particular viewpoint." JA386. This was error.

The provisions of the Guidelines that compel speech and expression all promote a viewpoint in favor of "gender affirming care." As discussed, foster families are permitted to obtain and maintain a license only if they affirmatively commit to participate in the social transition and facilitate the medical transition of foster children. Moreover, in addition to *compelling* speech that promotes "gender affirming care," the Guidelines also *prohibit* speech is critical of "gender affirming care." Policy 76, for example, prohibits foster families from disclosing a foster child's LGBTQ status to anyone or "attempt[ing] to persuade [a foster child] to . . . modify their . . . gender identity[] or gender expression" JA178, 180. These prohibitions—no less than the Guidelines' compulsions—constitute viewpoint

46

discrimination. *Matal*, 582 U.S. at 234; *see also Bates*, 2023 WL 7546002, at *18 (concluding that policy was viewpoint discriminatory "because it requires positive speech and restricts negative speech in the context of gender").

### C. The Department Cannot Satisfy Any Level of Heightened Scrutiny.

#### 1. The Guidelines fail strict scrutiny.

To justify its actions, the Department must satisfy strict scrutiny. *Agudath Israel*, 983 F.3d at 631 (free exercise); *Evergreen*, 740 F.3d at 244 (speech). To make this showing, the Department must show that the Guidelines "are narrowly tailored to serve a compelling state interest" and are "the 'least restrictive means' of achieving its objective." *Agudath Israel*, 983 F.3d at 631 (cleaned up); *see also Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 115 (2d Cir. 2017) (holding strict scrutiny requires showing of "no conceivable alternative"). The Department cannot satisfy this heavy burden.

The district court concluded that the Guidelines satisfied strict scrutiny. First, the court concluded "the government has a "compelling governmental interest in the protection of minor children." JA393 (cleaned up). Second, the court concluded that the Guidelines were narrowly tailored because "a family that is unwilling to provide the support mandated by the [Department] would no longer be a suitable placement for that child." JA395. These conclusions were erroneous.

*a. The Guidelines do not further a compelling purpose.*

While ensuring minor children's well-being is indisputably a compelling state interest in the abstract, the Department has not come close to establishing that the Guidelines' requirements that foster families participate in the social transition and facilitate the medical transition of children in their care serve that interest. Indeed, *The Cass Review* fatally undermines the Department's arguments. *The Cass Review* concluded that social transitioning was an "active intervention" in the lives of children that can change "gender outcomes," noting that there was a startling lack of evidence of its purported benefits in minors. JA109–16; *see also* JA87–88. And medical transitions fared even worse under *The Cass Review*'s close look at these treatments in minors. JA117–135; *see also* JA88–91.

The district court's analysis of the "compelling government interest" test amounted to a proclamation that the Department's general interest in the protection of minors is "well-established," JA393 (citing inapposite cases), and then insisting that "[e]valuating the efficacy or safety of a particular procedure is not within the [court's] purview." JA394.

This was error. "[T]o recite the Government's compelling interests is not to end the matter." *United States v. Alvarez*, 567 U.S. 709, 725 (2012). The district court's blind reliance on the Department's assertions that "gender affirming care" is necessary to protect minors effectively allowed the Department to satisfy its burden

48

based on nothing more than its own say-so. That is impermissible. *See Fulton*, 593 U.S. at 531 (holding that government does not satisfy strict scrutiny by proffering government interest at a "high level of generality"); *see also Agudath Israel*, 983 F.3d at 635 (observing the court "may not defer to the Governor simply because he is addressing a matter involving . . . public health").

Instead, the district court should have required the Department to demonstrate, through record evidence, that social and medical transitioning of transgender-identifying foster children directly furthers its interest in the well-being of children. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (concluding that the government did not prove a compelling interest where it could not "show a direct causal link between violent video games and harm to minors"); *OPAWL v. Yost*, 118 F.4th 770, 780 (6th Cir. 2024) (requiring defendant to prove "direct causal link between the restriction imposed and the injury to be prevented"). And because the Department failed to make this showing, this Court should reverse.

What is more, the Guidelines *undermine* the Department's claimed interest in children's well-being because they preclude loving parents like Appellants from participating in the foster-care program. Again, Appellants do not harbor discriminatory animus toward transgender-identifying children, and they would be glad to foster a transgender-identifying child. JA362. And if they were to foster such a child, they would love and support him or her just as they would any other child.

*Id*. Rather, they object only to being required to participate in and facilitate such a child's transition. *Id*. Nevertheless, the Department would rather deny a foster placement to the 98.6% children who do not have a transgender identity than risk putting the 1.4% of children who do have such an identity in Appellants' home. JA41. The Department's narrow (and misguided) focus on a small subset of the population of foster children to the detriment of all *other* foster children in the state "reveal[s] that [the Guidelines do] not actually advance a compelling interest." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015).

### b. The Guidelines are not the least restrictive means.

The Department also failed to establish that the Guidelines are the least restrictive means of accomplishing its goal. In short, requiring every foster family to agree—at the licensing stage—to participate in the social transition and facilitate the medical transition of children in their care is not the least restrictive means to achieve healthy foster-care placements. Most obviously, as the Court in *Blais* noted, the Department "could address LGBTQ+ concerns at the placement stage, rather than at licensing." 493 F. Supp. 3d at 1000. In other words, the Department could allow foster families to base their placement decisions on the foster child's gender identity, just as it does with respect to age, sex, special needs, and any other trait that does not fall within the terms of Rule 200. This is particularly true with respect to Appellants, considering they want to foster young children, almost none of whom

have a transgender identity. JA67. And in the "rare situation" where a young foster child may develop a transgender identity after being placed, the Department could simply "change placements" if it concluded Appellants were not providing the type of care it wanted them to. *Blais*, 493 F. Supp. 3d at 1000. This outcome would better serve the state's goals—and better address Vermont's foster-care crises—than excluding Appellants and the thousands of Vermonters who hold traditional views on gender identity from ever becoming foster parents.

The district court rejected this conclusion because it concluded that "removal of an LGBTQ foster child from their placement . . . because of their LGBTQ identity is extremely damaging to their . . . well-being." JA395. But to repeat (again): Appellants have no intention of discriminating against a transgender-identifying foster child *because of* that identity. JA362. Instead, they object only to the Department's requirement that they participate in the social transition and facilitate the medical transition of such a child. *Id*. Thus, if the Department were to remove a transgender-identifying child from Appellants' care, it would not be "because of their LGBTQ" identity. Instead, it would be because of the Department's views as to the specific forms of treatment such children must be given.

Moreover, the record establishes that removing *any* foster child—whether LGBTQ or not—from their placement can be damaging to their well-being. JA317 (noting importance of "permanency . . . for *all* youth in the foster care system"

51

(emphasis added)); *see also* JA 147 (noting that "[t]he ultimate goal of state care is to provide children . . . with safe, permanent homes—ideally with their parents"). Yet the Department regularly allows re-placement for other reasons—including age, sex, special needs, or that the placement was simply a "bad fit"—without revoking foster families' licensees. JA148, 150, 197, 361–62. Accordingly, the Guidelines are impermissibly underinclusive to the asserted need for stability. *Church of Lukumi*, 508 U.S. at 532 (holding law underinclusive when banning religious conduct while allowing identical secular conduct); *City of Ladue v. Gilleo*, 512 U.S. 43, 54 (1994) (noting underinclusive regulations undermine "the government's rationale for restricting speech in the first place").

To be clear, Appellants do not assert that they have the right to decide whether a foster child in their care undergoes a social or medical transition. Appellants acknowledge that, if they were to voluntarily accept placement of a transgender identifying child or voluntarily continue placement of a child who came to have a transgender identity while in their care, they would be required to comply with the Guidelines for that child. Rather, Appellants argue only that it violates the First Amendment to require them to participate in the social transition and facilitate the medical transition of children in their care as a condition to obtaining or maintaining a license. Accordingly, to comply with the First Amendment, the Department must allow Appellants to (1) opt-out of fostering transgender-identifying children and (2)

seek another placement for a child who comes to have a transgender identity while in their care.

The Department's total inflexibility to Appellant's proposed accommodation reveals the Guidelines are nothing more than a requirement that foster families "pledge their political allegiance" to the state's prevailing views. *Elrod v. Burns*, 427 U.S. 347, 355 (1976). The Guidelines' real goal is obvious: to weed out individuals from the foster program who hold views the state doesn't like. But the state cannot put its "thumb on the scales of the marketplace of ideas." *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 277 (2d Cir. 2010), *aff'd*, 564 U.S. 552 (2011). Nor can the state "reduce [an individual's] First Amendment rights by simply imposing a licensing requirement." *Nat'l Inst. of Family & Life Advocates v. Becerra ("NIFLA")*, 585 U.S. 755, 773 (2018). Yet that is precisely what the Guidelines attempt to do. Accordingly, they fail strict scrutiny.

### 2. The Guidelines fail intermediate scrutiny.

Even if the Guidelines regulated conduct, that conduct is inherently expressive. Accordingly, the Department must demonstrate that the Guidelines at least satisfy intermediate scrutiny. *White River*, 481 F.3d at 169. That is, the Guidelines must "further[] an important or substantial government interest" and "the restriction [on speech must not be] greater than is essential." *Id.*; *see also United*

*States v. O'Brien*, 391 U.S. 367 (1968). The Guidelines fail this test for the same reasons they fail strict scrutiny.

First, the Guidelines do not further an important or substantial government interest. As explained, while the well-being of foster children is an important aim, the Department has not shown that the Guidelines further it. Instead, the Guidelines undermine that aim because they require exclusion of foster families with loving homes like Appellants.

Second, the Guidelines' restrictions on speech are not essential to the state's anti-discrimination purpose. The Department could allow foster families to "opt out" of fostering transgender-identifying children at the placement stage or find another placement in the unlikely scenario a child already in the home begins to identify as transgender. As in the context of strict scrutiny, the Guidelines' "underinclus[ivity]" is fatal here too. *NIFLA*, 585 U.S. at 774 (cleaned up). Accordingly, the Department has failed to meet its burden of showing these are not viable alternatives that are less burdensome of foster parents' First Amendment rights.

## II.  APPELLANTS SATISFY THE REMAINING INJUNCTION FACTORS

The district court concluded that because Appellants were unlikely to succeed on the merits, they could not satisfy the other preliminary injunction factors either. JA395–96. But because the district court's conclusion on the likelihood of success

on the merits was erroneous, its weighing of the remaining injunction factors was also erroneous.

First, "[t]he loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Agudath Israel*, 983 F.3d at 636. Because Appellants have demonstrated a likelihood of success on the merits of their First Amendment claims, they have also demonstrated irreparable harm. *Id.* Indeed, Appellants' irreparable harm here is acute. The inability to foster children is a unique harm. *See, e.g.*, *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 854 (1977) (recognizing that foster parents may suffer significant emotional harm from the disruption of relationship with foster children). In addition, Appellants want their young son to experience the benefits of having a foster sibling. JA27–28. Every day that passes, their son loses the benefits that a foster sibling would give him. This also constitutes irreparable harm. *See Tellock v. Davis*, 84 F. App'x 109, 111 (2d Cir. 2003) (concluding "irreparable harm" existed where "there [was] a continuing harm . . . for which money damages [could] not provide adequate compensation").

Second, granting Appellants a preliminary injunction is in the public interest. "[S]ecuring First Amendment rights is in the public interest." *SAM Party of New York v. Kosinski,* 987 F.3d 267, 278 (2d Cir. 2021). Moreover, the Department has already concluded that—but for the Guidelines' unconstitutional provisions—Appellants' home is suitable for housing foster children. Especially considering the

current foster care crises, the public has an interest in foster children being placed with loving parents like Appellants instead of being housed in hospital emergency rooms or police stations.

Further, neither the Department nor anyone else will be harmed by a preliminary injunction. Because Appellants are likely to succeed on the merits, the state will suffer no harm by being unable to enforce the Guidelines against them during the pendency of this litigation. *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) (noting that "[t]here can be no irreparable harm to [the government] when it is prevented from enforcing an unconstitutional statute" (cleaned up)). Moreover, granting Appellants' preliminary injunction will not harm any foster child. Appellants seek the modest relief of allowing them—and only them—to (1) opt-out of fostering transgender-identifying children and (2) seek another placement for a child who comes to have a transgender identity while in their care. Granting Appellants this narrow relief during the pendency of this litigation will harm no one.

## CONCLUSION

For the foregoing reasons, the Court should REVERSE the district court's denial of Appellants' Motion for Preliminary Injunction and REMAND with instructions for the district court to preliminarily enjoin the Department's revocation of their license during the pendency of this litigation.

May 2, 2025                                        Respectfully submitted,

                                                   */s/ Josh Dixon*
                                                   Josh Dixon
                                                   Center for American Liberty
                                                   PO Box 200942
                                                   Pittsburgh, PA 15251-0942
                                                   (703) 687-6212
                                                   jdixon@libertycenter.org

                                                   *Attorney for Plaintiff-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) and LR 32.1(a)(4)(A) because this brief contains 12,919 words, excluding the parts exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman.

Respectfully submitted,

*/s/ Josh Dixon*
Josh Dixon
*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2025, I electronically filed the foregoing Certificate with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Josh Dixon*
Josh Dixon
*Attorney for Plaintiffs-Appellants*