# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

MELINDA ANTONUCCI,
CASEY MATHIEU,
        Plaintiffs-Appellants,

   vs.

CHRISTOPHER WINTERS, et al.,
        Defendants-Appellees.

Case No. 25-514

**JOINT STIPULATION OF DISMISSAL AND PLAINTIFFS-APPELLANTS' UNOPPOSED MOTION TO VACATE THE DISTRICT COURT JUDGMENT**

Pursuant to Federal Rule of Appellate Procedure 42(b)(1), the Parties hereby stipulate to dismiss this appeal. Plaintiffs-Appellants move to vacate the district court's preliminary-injunction Order (Dkt. 50). Defendants-Appellees do not oppose vacatur.

**Background**

This case arises from a prior Vermont Department of Children and Families' ("the Department") policy requiring foster parents to be "supporting and affirming" of a child's sexual orientation, gender identity, and gender expression. Joint App. ("JA") 342. This policy led the Department to revoke Appellants' foster-care licenses. JA288–91. Appellants then sued Department officials and sought a

preliminary injunction against Vermont's policy. JA292–93. The district court denied that motion, and Appellants filed this appeal. *See* JA367–97.

On February 18, the Department issued new guidance for licensing foster parents. Ex. A. Under this guidance, "[a]pplicants' sincerely held personal, cultural, religious, moral, or philosophical beliefs shall not be considered in the licensing process." *Id.* at 3. Further, the Department does not require "endorsement or affirmation of specific identities," *id.* at 5, or the "use of particular vocabulary, prescribed language, or preferred pronouns related to gender identity, sexual orientation, or identity expression," *id.*

Appellees have also represented that the Department will rescind the decision to revoke Appellants' foster-care licenses, that Appellants' licenses will be reinstated, and that the previous grounds for revocation will no longer operate to exclude Plaintiffs. The Parties have agreed to file a Joint Stipulation and Final Judgment in the District Court (Ex. B) reflecting the substantive terms of the relief agreed to by the Parties. The Parties have also executed a settlement agreement reflecting Vermont's commitment to carry out its policy changes, the Parties' intent and understanding of their agreement and the releases of liability. Ex. C. The Parties agree that each party shall bear their own costs and fees.

In light of the Department's new guidance and the settlement agreement, the Parties agree that this appeal is now moot and should be dismissed.

**Motion**

When an appeal becomes moot, "[t]he established practice ... is to reverse or vacate the judgment below." *United States v. Munsingwear,* 340 U.S. 36, 39 & n.2 (1950). "In the ordinary run of cases . . . courts have been liberal in granting vacatur." *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*, 260 F.3d 114, 121 (2d Cir. 2001). Courts will routinely vacate preliminary judgments that have become moot too. *See, e.g.*, *Azar v. Garza*, 584 U.S. 726, 729–30 (2018) (per curiam) (vacating grant of temporary restraining order); *Harper ex. rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007) (vacating denial of preliminary injunction).

This liberal rule applies with even more force "when mootness occurs through . . . the unilateral action of the party who prevailed in the lower court." *Azar*, 584 U.S. at 729–30 (cleaned up). Because vacatur is "rooted in equity," it would be unfair to let an adverse judgment stand because of circumstances beyond the appellant's control. *Russman*, 260 F.3d at 121. So vacatur is appropriate when the government repeals a challenged policy thereby mooting the plaintiffs' request for relief. *Chrysafis v. Marks*, 15 F.4th 208, 211 (2d Cir. 2021) (vacating dismissal and denial of preliminary injunction because "mootness [was] attributable to a change in the legal framework"); *see also Coll. Standard Mag. v. Student Ass'n of State of Univ.*

3

*of New York at Albany*, 610 F.3d 33, 35 (2d Cir. 2010) (vacating district court's judgment because school's repeal of challenged policy mooted the case).

This is just such a case. Vermont (commendably) changed the challenged policy to ensure that "[a]pplicants shall not be excluded based on [their religious] beliefs nor on an intent to live, parent, and make day-to-day caregiving decisions consistent with those beliefs." Ex. A. By abandoning the previous policy that Plaintiffs sought to enjoin, the State's "unilateral action" mooted this appeal. *Azar*, 584 U.S. at 729. And in that case, "a party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *Russman*, 260 F.3d at 121 (cleaned up).

Because Vermont has repealed the challenged policy to moot this appeal, and because the Parties have reached a settlement, this Court should dismiss this appeal and vacate the lower court's preliminary injunction order. In addition, the Parties respectfully request that this Court rule on this motion sufficiently in advance of the oral argument date, currently set for February 26, 2026, such that the Plaintiffs and the State need not expend additional resources traveling to New York.

February 20, 2026                    Respectfully submitted,

                                     By:    /s/ Courtney Corbello
                                            Courtney Corbello
                                            Joshua Dixon
                                            Center for American Liberty
                                            2145 14th Avenue, Suite 8
                                            Vero Beach, FL 32960
                                            (703) 687-6212
                                            jdixon@libertycenter.org
                                            ccorbello@libertycenter.org

                                            Robert Kaplan
                                            Kaplan and Kaplan
                                            95 St. Paul Street Ste. 405
                                            Burlington, VT 05401
                                            (802) 651-0013
                                            rkaplan@kaplanlawvt.com

                                            *Counsel for Appellants*

                                     By:    /s/ Ryan Kane
                                            Ryan P. Kane
                                            Deputy Solicitor General
                                            Office of the Attorney General
                                            109 State Street
                                            Montpelier, VT 05609-1001
                                            (802) 828-2153
                                            ryan.kane@vermont.gov

                                            *Counsel for Appellees*

# Exhibit A

State of Vermont Agency of Human Services
**Department for Children and Families**
**Family Services Division**

## Practice Guidance: Supporting Conversations with Foster Care Applicants About Caring for LGBTQ+ Youth

### Policy Information

| Chapter/Category: | Supersedes: |
|---|---|
| Residential Licensing and Special Investigations (RLSI) | N/A – New Practice Guidance Document |
| | **Effective Date:** |
| **Related Documents:** | |
| FSD Policy 221: Foster Care Licensing | 02/18/2026 |

**Authorizing Signature:** *Aryka S Radke*

Aryka Radke, Deputy Commissioner, Family Services Division

## Table of Contents

Purpose ........................................................................................................................................ 1
Guiding Principles ........................................................................................................................ 2
Core Behavioral Expectation ...................................................................................................... 3
Areas RLSI Evaluates and May Explore Through Conversation ............................................... 4
What RLSI Does Not Evaluate .................................................................................................... 5
Placement Matching Considerations .......................................................................................... 5
Discussion Prompts ..................................................................................................................... 6
Conclusion ................................................................................................................................... 7

## Purpose

The Foster Care Application includes a self-assessment questionnaire designed to help applicants reflect on their caregiving interests, strengths, and placement preferences. Among many questions, applicants are asked to respond to the following:

> **"I am open to caring for a lesbian, gay, bisexual, transgender, or queer (LGBTQ) child/youth."**

This question is one of many intended to help the Division understand where caregivers feel most confident, where they may want additional support or training, and how to make informed



VERMONT
**DEPARTMENT FOR CHILDREN & FAMILIES**
**FAMILY SERVICES DIVISION**

**State of Vermont Agency of Human Services**
**Department for Children and Families**
**Family Services Division**

placement decisions later in the process.

This practice guidance supports the Residential Licensing & Special Investigations (RLSI) Team in having open, neutral, relational conversations with applicants about their experience, comfort level, and readiness to care for LGBTQ+ children and youth. These conversations are not about changing beliefs; rather, they help assess caregiving behaviors, understand strengths and limitations, and support thoughtful, well-aligned future placement matching.

While this guidance offers focused considerations for LGBTQ+ youth, it builds directly on the Division's existing matching philosophy and practices. LGBTQ+-specific guidance is an extension of the work we already do to match children and caregivers across a wide range of identities, needs, interests, behaviors, trauma responses, cultures, and experiences. Over time, this framework will continue to expand to provide even broader, more integrated guidance that supports thoughtful matching for all children and youth.

### Guiding Principles

#### 1. Conversations focus on caregiving capacity — not beliefs.
Applicants bring diverse lived experiences, values, cultures, and comfort levels. Conversations during the licensing process aim to understand caregiving approaches, day-to-day interactions with youth, and the environment a young person would experience in the home. They do not evaluate or interpret an applicant's personal beliefs. The emphasis is on how a caregiver interacts with and cares for youth, not why they hold particular viewpoints.

#### 2. Safety — physical and emotional — is the core licensing focus.
All licensed caregivers must provide a home free from rejection, shaming, discriminatory behavior, or hostility. This expectation applies to all children and youth, including LGBTQ+ youth. Licensing aims to gather information about whether caregivers can demonstrate safe, supportive, non-judgmental, and non-discriminatory care in their day-to-day interactions and caregiving practices.

Licensing evaluates all aspects of physical and emotional safety. Concerns about safety are addressed through existing licensing processes when there is evidence that a caregiver's actions, responses, or home environment may place a child at danger or risk. Holding or respectfully expressing personal, religious, or moral beliefs alone does not constitute a licensing concern.

#### 3. Limitations belong in the placement matching process.
Applicants may identify comfort levels, preferences, or areas where they feel less prepared. These do not affect licensure. Instead, they help guide later placement decisions, which consider the needs and identities of actual children and youth—not hypothetical situations. Consistent with Division practice, placement decision-making begins with family finding and exploration of kin and fictive kin resources and continues throughout an open case, regardless of current placement, to promote permanency and


**VERMONT**
**DEPARTMENT FOR CHILDREN & FAMILIES**
**FAMILY SERVICES DIVISION**

**State of Vermont Agency of Human Services**
**Department for Children and Families**
**Family Services Division**

lifelong family connections. Matching is an ongoing process, and a caregiver's strengths, preferences, and limitations are revisited to ensure the best possible fit for each youth. Licensure establishes whether a home is safe; matching supports whether a particular home is the right fit for a specific youth at a specific time.

**4. Caregivers vary in experience, comfort, and readiness—and that is expected.**
Adults naturally differ in their familiarity with identities, cultures, or experiences that may be new to them. Because licensing decisions rely on information gathered during the time-limited applicant interview and site evaluation, the goal is to understand where applicants are beginning—not to anticipate future behaviors or evaluate viewpoints. The information gathered helps guide conversations, not predict or assume caregiver actions. Information gathered is used to guide supportive conversations and placement planning, not to presume future misconduct.

**5. Licensing evaluates behavior, not viewpoints.**
On behalf of the Department and Division, RLSI requires caregivers to maintain a safe, stable, and non-discriminatory home. The foster care application process does not require applicants to adopt, express, or endorse specific beliefs, viewpoints, or language as a condition of approval. This approach honors both child safety and caregiver autonomy while ensuring regulatory compliance.

Applicants' sincerely held personal, cultural, religious, moral, or philosophical beliefs shall not be considered in the licensing process. Applicants shall not be excluded based on any such beliefs nor on an intent to live, parent, and make day-to-day caregiving decisions consistent with those beliefs, so long as required standards of safety, care, non-discrimination, and respect for a child's safety, well-being, and dignity are met.

Licensing decisions are based on observable caregiving behaviors and demonstrated capacity to meet required standards in practice. In evaluating applications, the Division distinguishes between:

- Beliefs or viewpoints, which are not evaluated for licensure;
- Respectful, age-appropriate, and non-coercive communication, which is permitted; and
- Behaviors that cause harm, coercion, exclusion, or discrimination, which are not permitted and may affect licensure.

An applicant's statements of belief or personal conviction during the licensing process may not, by themselves, constitute evidence of risk, harm, or noncompliance.

**Core Behavioral Expectation**

Caregivers must provide a safe home free from rejection, shaming, or discriminatory behavior. This includes the ability to:



State of Vermont Agency of Human Services
Department for Children and Families
Family Services Division

- respond to children and youth in ways that do not cause physical, emotional, or psychological harm
- maintain an environment where youth feel safe expressing themselves
- refrain from behaviors that ridicule, demean, or isolate a youth
- partner with DCF and providers to ensure youth needs are met
- support the youth's hobbies, interests, and passions
- support youth in accessing school or community activities that promote safety and belonging

## Children & Youth's Rights Framework

Children and youth must always be at the center of the Division's work. While this is not an exhaustive list below, caregivers must uphold the rights of children and youth in foster care, including the right to:

- have their identity, culture, religious, moral, and philosophical beliefs, and lived experiences understood and respected in placement
- maintain meaningful connections with family, kin, and community supports
- participate in decisions about who they live with and what type of caregiver or home environment feels safe
- have their voice and perspective meaningfully included and elevated in case planning and decision-making
- express their personality and identity through clothing, hairstyle, cultural practice, or other forms of self-expression
- be free from shaming, punishment, coercion, or attempts to change who they are
- access supportive environments (e.g., school groups, counseling, peer supports)
- partake in or decline participation in religious activities without consequences, discipline, or retaliation
- experience safety, dignity, and nondiscrimination in their home

These expectations establish the minimum standard of care required for every licensed home and reflect Vermont's responsibility to protect children – not to impose a particular viewpoint on caregivers. A caregiver's failure to use particular language or adopt certain beliefs does not itself violate these rights.

## Areas RLSI Evaluates and May Explore Through Conversation

RLSI staff may use open-ended, neutral questions to understand:
- the caregiver's comfort supporting youth with diverse identities
- how the caregiver responds when a youth shares something personal or unfamiliar
- their typical approach to providing stability, belonging, and emotional support
- areas where additional training or information may be helpful

These conversations occur during the licensing phase to understand general caregiving capacity. They are not used to determine placement suitability for any specific child, which is addressed separately through the placement matching process.

VERMONT
DEPARTMENT FOR CHILDREN & FAMILIES
FAMILY SERVICES DIVISION

State of Vermont Agency of Human Services
Department for Children and Families
Family Services Division

As part of these conversations, RLSI will explain the regulations caregivers must follow, what types of actions could violate those regulations, and the potential consequences. This supports informed caregiving and clear expectations.

At the same time, RLSI does not assume that an applicant will engage in prohibited conduct simply because of their stated beliefs, values, or identified limitations. Conversations focus on actual caregiving behavior, not possible future violations.

## What RLSI Does Not Evaluate

Licensing does not require:
- endorsement or affirmation of specific identities
- agreement with certain viewpoints
- changes to personal, cultural, religious, moral, or philosophical beliefs
- use of particular vocabulary, prescribed language, or preferred pronouns related to gender identity, sexual orientation, or identity expression
- answers to certain hypothetical ideological or future-speech scenarios
- discussion of medical decisions that caregivers cannot independently make[1]
- agreement to facilitate medical appointments or procedures related to gender affirming care
- personal agreement with, or adoption of, specific terminology, identity frameworks, or expressive practices as a condition of licensure, so long as the caregiver's conduct remains respectful, non-coercive, and consistent with safety requirements.

## Placement Matching Considerations

Placement matching is guided by the young person's needs, voice, and sense of belonging. Matching decisions consider:
- the youth's identity, lived experience, and expressed preferences
- their need for a placement where they feel safe, respected, and able to be themselves
- the importance of cultural, familial, and community connections
- the caregiver's strengths, caregiving style, and willingness to learn or seek support
- any limitations that may affect a youth's experience in the home

Expressing limitations or preferences around caring for children and youth with diverse identities,

---

[1] When a young person is in DCF custody, caregivers are provided with the Division's Caregiver Authorization Letter. This letter permits caregivers to obtain routine and emergency medical treatment for the child. Caregivers are not the legal medical decision-makers for children in DCF custody. Medical decision-making authority remains with the Department, in consultation with the young person (as age- and developmentally appropriate), medical providers, and parents.



**State of Vermont Agency of Human Services**
**Department for Children and Families**
**Family Services Division**

experiences, or needs—including preferences related to age, behaviors, medical, developmental, or mental health needs, or LGBTQ+ identity—is not inherently discriminatory. These are normal considerations that belong in matching, not licensing. This approach allows caregivers to voluntarily identify the populations they feel most prepared and equipped to support.

**Belonging matters.** Children and youth experience better outcomes when placed with caregivers who can support their identity, culture, and expression—whether related to race, ethnicity, religion, sexual orientation, gender identity, disability, trauma history, or other lived experiences. Caregivers do not need specialized expertise; they need the ability to create a safe environment and a willingness to learn.

**Matching is not about ideology; it is about fit.** A caregiver's stated preferences or limitations—including those related to caring for LGBTQ+ youth—help the Division identify the best possible match between a youth's needs and a caregiver's strengths and readiness.

**Youth voice matters.** Young people may express their preferences regarding placement, identity, connections, and other personal experiences when they feel ready to do so. Youth engagement is central to identifying supportive placements.

Because some youth may not yet be aware of, or ready to share, aspects of their identity, background, trauma history, needs, or other sensitive experiences when entering care, regular contacts by Family Services Workers, attorneys, and GALs serve as important safeguards to ensure youth safety and emotional well-being.

The Division works to ensure that each youth is matched with caregivers who can safely and confidently meet their needs. Youth also have the right to request consultation with the Commissioner's Committee on LGBTQ Issues if they feel unsafe, unsupported, or discriminated against.

**Discussion Prompts**

The questions below are examples of prompts that may be used to support open, relational conversation. They are not exhaustive, nor is each question required in every discussion.

- "Tell me about your experience supporting young people whose identities or experiences are different from your own."
- "How comfortable do you feel supporting a young person who identifies as LGBTQ+?"
- "When a youth shares something important about themselves, what does support look like in your home?"
- "How do you create an environment where youth feel safe talking about what is happening in their lives?"
- "Youth sometimes share things that surprise adults. How do you typically respond?"
- "If a young person expressed something personal about their identity or came out to you, how would you respond?"



State of Vermont Agency of Human Services
Department for Children and Families
Family Services Division

- "Are there areas where you would like more information or support to feel prepared for different types of placements?"
- "When a youth raises questions or experiences that feel new, what helps you learn or find guidance?"
- "It's completely normal to have areas where you feel more or less confident. Are there particular placement situations where you feel you'd be a strong fit—or not the best fit?"
- "Are there any preferences or limitations you'd like us to keep in mind for matching?"

## Conclusion

This practice guidance is an early step in strengthening how we engage applicants, understand caregiving capacity, and support thoughtful placement matching. It will continue to grow and evolve as we learn from staff, caregivers, youth, partners, and ongoing implementation efforts. Updates to the Foster Care Application and Renewal Application, along with development of a companion matching tool for district staff are also in development, which will help bridge the licensing and placement phases to ensure alignment with the Division's broader matching philosophy.



DEPARTMENT FOR CHILDREN & FAMILIES
FAMILY SERVICES DIVISION

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

MELINDA ANTONUCCI,
CASEY MATHIEU,
      Plaintiffs,

      vs.

CHRISTOPHER WINTERS, et. al,
      Defendants.

Case No. 2:24-CV-783

## JOINT STIPULATION AND FINAL JUDGMENT ORDER

Plaintiffs Melinda Antonucci and Casey Mathieu ("Plaintiffs") and Defendants Sandi Hoffman, in her personal and official capacity as Interim Commissioner of the Vermont Department for Children and Families; Aryka Radke, in her personal and official capacity as Deputy Commissioner, Vermont Department for Children and Families, Family Services Division; Stacey Edmunds, in her personal and official capacity as Director, Residential Licensing & Special Investigations, Vermont Department for Children and Families; and Paula Catherine, in her personal and official capacity as a Licensing Officer, Residential Licensing & Special Investigations, Vermont Department for Children and Families ("Defendants"), by and through their undersigned counsel, hereby stipulate and agree to the entry of this Final Judgment.

Plaintiffs commenced this action pursuant to 42 U.S.C. § 1983 alleging that the Vermont Department for Children and Families' foster care licensing determinations and related policies and practices violated their constitutional rights. Defendants deny any violation of law. On February 18, 2026, DCF issued a new Practice Guidance document ending the challenged policies and practices. Ex. A. Under this Practice Guidance, DCF has agreed to rescind the previous

1

revocation decisions and reinstate Plaintiffs' foster care licenses. The parties now jointly move to enter a stipulated order and final judgment in this case.

The Court, having jurisdiction over the parties and the subject matter of this action, and consistent with the Parties' agreed-to resolution of this matter, hereby enters the following Final Judgment.

IT IS HEREBY ORDERED:

1.     Defendants shall reinstate Plaintiffs' foster care license to the same status, terms, conditions, and scope that existed immediately prior to its revocation or non-renewal. Reinstatement shall occur within the time agreed to in the Parties' settlement agreement.

2.     Defendants represent that the Practice Guidance entitled "Supporting Conversations with Foster Care Applicants About Caring for LGBTQ+ Youth" (Ex. A) has been adopted in the form agreed to by the parties and governs foster care licensing determinations statewide. Defendants shall apply that Guidance in their evaluation of Plaintiffs.

3.     In evaluating Plaintiffs' eligibility for foster care licensure or renewal, Defendants shall not:

   a. consider Plaintiffs' protected speech, religious beliefs, or viewpoints regarding sexual orientation, gender identity, or related issues as a basis for licensure or renewal determinations;

   b. condition licensure or renewal determinations on Plaintiffs' affirmation, endorsement, or adoption of any particular ideological or value-based positions regarding sexual orientation or gender identity;

   c. require Plaintiffs to engage in ideological or value-laden speech as a condition of foster care licensure or renewal.

2

4.      Defendants agree that the Practice Guidance shall govern considerations related to LGBTQ+ youth in Plaintiffs' foster parent licensure and licensing determinations. Policy 76 shall remain in effect solely as an internal policy applicable to Department staff and shall not be used, referenced, or relied upon in any manner in licensing determinations, investigations, or evaluations of foster parents or foster parent license applicants. Policy 76 shall not be applied in evaluating Plaintiffs' eligibility for foster care licensure.

5.      Defendants shall not take adverse licensing action against Plaintiffs in retaliation for Plaintiffs' participation in this action or assertion of constitutional rights.

6.      This Final Judgment resolves all claims asserted in this action.

7.      Each party shall bear their own costs and fees.

8.      The Court retains jurisdiction solely for the purpose of enforcing this Final Judgment.


APPROVED and SO ORDERED:


Date: _____          _____
                                                                                Judge William K. Sessions III

# Exhibit C

Case: 25-5114, 02/20/2026, DktEntry: 36.5, Page 18 of 35

**SETTLEMENT AGREEMENT**
*ANTONUCCI, ET AL. V. WINTERS, ET AL.*, CASE NO. 2:24-CV-783,
UNITED STATES DISTRICT COURT, DISTRICT OF VERMONT

This Settlement Agreement ("Agreement"), effective as of the last date in the signature blocks that follow (the "Effective Date"), is entered into between Plaintiffs Melinda Antonucci and Casey Mathieu ("Plaintiffs"), on the one hand, and Defendant Sandi Hoffman, in her personal and official capacity as Interim Commissioner of the Vermont Department for Children and Families, duly authorized to enter into this Settlement Agreement on behalf of the Department and the other Defendants in this suit, Aryka Radke, in her personal and official capacity as Deputy Commissioner, Vermont Department for Children and Families, Family Services Division; Stacey Edmunds, in her personal and official capacity as Director, Residential Licensing & Special Investigations, Vermont Department for Children and Families; and Paula Catherine, in her personal and official capacity as a Licensing Officer, Residential Licensing & Special Investigations, Vermont Department for Children and Families ("Defendants"), on the other hand. This Agreement will refer to "Plaintiffs" and "Defendants" collectively as the "Parties."

**PREAMBLE**

1. On July 17, 2024, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief captioned *Melinda Antonucci et al., v. Christopher Winters, et al.*, Case No. 2:24-cv-00783, and Motion for Preliminary Injunction in the United States District Court for the District of Vermont (the "Action"). In the Action, Plaintiffs alleged violations of the First and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983 related to Defendants' revocation of their foster parent license.

2. The Parties agree that it is in their mutual interests to fully and finally resolve all disputes between them, including but not limited to the disputes and claims for relief alleged in the Action, pursuant to the terms of this Agreement.

3. The Parties individually warrant that each has the power, capacity, and authority to enter into this Agreement, and that no claim released by this Agreement has been or will be assigned to any third parties who are not signatories to this Agreement.

4. All obligations undertaken by Defendants relating to policy adoption, enforcement, or implementation are undertaken solely in their official capacities.

1

5. Nothing in this Agreement shall be construed as an admission by Plaintiffs that Defendants' conduct was lawful or constitutional, or that Plaintiffs' claims lacked merit.

6. Nothing in this Agreement shall be construed as an admission by Defendants as to liability, guilt, or fault related to the Action.

7. To avoid the delay, uncertainty, inconvenience and expense of protracted litigation, the Parties reach a full and final settlement as set forth below.

## TERMS AND CONDITIONS

In consideration of the mutual promises, covenants and obligations set forth below, and for good and valuable consideration as stated herein, and before taking of any testimony, and without adjudication of any issue of fact or law, and upon consent and agreement of the Parties, it is hereby agreed and stipulated as follows:

1. The Parties agree that all substantive obligations resolving this action are set forth in the Final Judgment entered by the Court. This Agreement addresses only matters ancillary to that judgment.

2. Within 30 (thirty) days of the Effective Date, Defendants shall reinstate Plaintiffs' foster care license to the same status, terms, conditions, and scope that existed immediately prior to its revocation or non-renewal.

3. Within 30 (thirty) days of the Effective Date, Defendants shall formally adopt and implement the Practice Guidance attached hereto as Attachment 1 to govern considerations related to LGBTQ+ youth and foster parent licensure in the State of Vermont. Defendants shall provide Plaintiffs written confirmation of adoption of the Practice Guidance, including the effective date.

4. Defendants agree that the Practice Guidance prohibits them from:

   a. engaging in any formal or informal practice of evaluating foster parent applicants' protected speech, viewpoints, or religious beliefs regarding sexual orientation, gender identity, or related issues as a condition of licensure;

   b. denying, revoking, or delaying foster parent licensure based on an applicant's refusal to affirm, endorse, or adopt any particular views regarding gender identity, sexual orientation, or related ideological concepts;

   c. conditioning foster parent licensure on speculative or hypothetical future scenarios involving a child's gender identity, "gender-affirming" medical care, or gender expression;

2

d. considering placement-specific compatibility factors at the foster parent licensing stage as a basis for licensure determinations, except as expressly authorized by the Practice Guidance; and

e. retaliating against foster parents or foster parent applicants for engaging in protected speech or for asserting constitutional or statutory rights related to foster care licensure.

5. Within 5 (five) days of the Effective Date, the Parties agree to jointly move the United States Court of Appeals for the Second Circuit to dismiss the appeal (Case No. 25-514) pursuant to Federal Rule of Appellate Procedure 42(b). Plaintiffs will also move to vacate the District Court's order and Defendants agree not to oppose vacatur. The Parties understand vacatur is within the discretion of the United States Court of Appeals for the Second Circuit.

6. If the Second Circuit denies the Parties' motion to vacate the District Court's order denying Plaintiffs' Motion for Preliminary Injunction (Dkt. 50), the Parties agree, upon dismissal of the appeal, that Plaintiffs will move the District Court to vacate its Order dated February 20, 2025 denying Plaintiffs' Motion for Preliminary Injunction (Dkt. 50) and to consider whether any further vacatur is appropriate in light of the Parties' Agreement and Defendants agree not to oppose vacatur but reserve the right to take no position on Plaintiffs' motion. The Parties understand vacatur is within the discretion of the District Court.

7. After the motion(s) to vacate have been ruled on, the Parties agree to file a Joint Stipulation and Proposed Final Judgment Order in the United States District Court for the District of Vermont with the proposed order attached hereto as Attachment 2.

8. Plaintiffs agree to file the Joint Stipulation and Proposed Final Judgment Order as referred to in Paragraph 5 of this section of the Agreement upon satisfaction of following conditions (1) Plaintiffs' receipt of written confirmation that the Practice Guidance has been revised, adopted and implemented as contemplated in this Agreement; and (2) Plaintiffs receiving written confirmation from Defendants that their foster parent license has been restored.

9. Effective upon the filing of the Joint Stipulation and Proposed Final Judgment Order as referred to in paragraph 5 of this section of the Agreement, the Parties agree to release, discharge, and forever hold the other harmless from all arising from or related to presently existing claims, demands, or suits, known or unknown, fixed or contingent, liquidated or unliquidated, whether or

not asserted in the Action as of this date. This mutual release runs to the benefit of the Parties in both their official and individual capacities.

10. If any provision of this Agreement is held invalid, illegal, or unenforceable in any respect, the remaining provisions shall remain in full force and effect, and the Parties shall negotiate in good faith to replace the invalid provision with a valid provision that most closely reflects the Parties' original intent.

11. The Parties understand and acknowledge that the facts and law upon which the foregoing releases are based may hereafter turn out to be other than or different from the facts and law now known or believed to be true. They assume the risk that the facts and law might be different and agree that such a difference will not terminate or entitle a party to rescind this Agreement.

12. The Parties have read this Agreement and understand all aspects of it.

13. The Parties represent that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

14. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

15. The provisions of this Agreement shall apply to, be binding on, and inure to the benefit of the Parties to this action and their successors and assigns.

(*Signature block begins on next page*)

2-19-24

Date

**Melinda Antonucci**
*Plaintiff, in her individual capacity*

2-19-26

Date

**Casey Mathieu**
*Plaintiff, in his individual capacity*

2/18/26

Date

**Sandi Hoffman**
*In her personal and official capacity as Interim
Commissioner of the Vermont Department for Children and
Families, duly authorized to enter into this Settlement
Agreement on behalf of the Department and all other
Defendants*

*Approved as to form:*

2/19/26

Date

**Joshua Dixon**
**CENTER FOR AMERICAN LIBERTY**
*Attorney for Plaintiffs*

2/19/2026

Date

**Ryan Kane**
**VERMONT ATTORNEY GENERAL'S OFFICE**
*Attorney for Defendants*

5

# Attachment 1

State of Vermont Agency of Human Services
Department for Children and Families
Family Services Division

## Practice Guidance: Supporting Conversations with Foster Care Applicants About Caring for LGBTQ+ Youth

### Policy Information

| | |
|---|---|
| **Chapter/Category:** | **Supersedes:** |
| Residential Licensing and Special Investigations (RLSI) | N/A – New Practice Guidance Document |
| | **Effective Date:** |
| **Related Documents:** | |
| FSD Policy 221: Foster Care Licensing | 02/18/2026 |

**Authorizing Signature:** *Aryka S Radke*

Aryka Radke, Deputy Commissioner, Family Services Division

## Table of Contents

Purpose ............................................................................................................. 1
Guiding Principles ............................................................................................. 2
Core Behavioral Expectation ........................................................................... 3
Areas RLSI Evaluates and May Explore Through Conversation ..................... 4
What RLSI Does Not Evaluate ......................................................................... 5
Placement Matching Considerations ............................................................... 5
Discussion Prompts .......................................................................................... 6
Conclusion ........................................................................................................ 7

## Purpose

The Foster Care Application includes a self-assessment questionnaire designed to help applicants reflect on their caregiving interests, strengths, and placement preferences. Among many questions, applicants are asked to respond to the following:

> **"I am open to caring for a lesbian, gay, bisexual, transgender, or queer (LGBTQ) child/youth."**

This question is one of many intended to help the Division understand where caregivers feel most confident, where they may want additional support or training, and how to make informed



DEPARTMENT FOR CHILDREN & FAMILIES
FAMILY SERVICES DIVISION

**State of Vermont Agency of Human Services**
**Department for Children and Families**
**Family Services Division**

placement decisions later in the process.

This practice guidance supports the Residential Licensing & Special Investigations (RLSI) Team in having open, neutral, relational conversations with applicants about their experience, comfort level, and readiness to care for LGBTQ+ children and youth. These conversations are not about changing beliefs; rather, they help assess caregiving behaviors, understand strengths and limitations, and support thoughtful, well-aligned future placement matching.

While this guidance offers focused considerations for LGBTQ+ youth, it builds directly on the Division's existing matching philosophy and practices. LGBTQ+-specific guidance is an extension of the work we already do to match children and caregivers across a wide range of identities, needs, interests, behaviors, trauma responses, cultures, and experiences. Over time, this framework will continue to expand to provide even broader, more integrated guidance that supports thoughtful matching for all children and youth.

**Guiding Principles**

### 1. Conversations focus on caregiving capacity — not beliefs.
Applicants bring diverse lived experiences, values, cultures, and comfort levels. Conversations during the licensing process aim to understand caregiving approaches, day-to-day interactions with youth, and the environment a young person would experience in the home. They do not evaluate or interpret an applicant's personal beliefs. The emphasis is on how a caregiver interacts with and cares for youth, not why they hold particular viewpoints.

### 2. Safety — physical and emotional — is the core licensing focus.
All licensed caregivers must provide a home free from rejection, shaming, discriminatory behavior, or hostility. This expectation applies to all children and youth, including LGBTQ+ youth. Licensing aims to gather information about whether caregivers can demonstrate safe, supportive, non-judgmental, and non-discriminatory care in their day-to-day interactions and caregiving practices.

Licensing evaluates all aspects of physical and emotional safety. Concerns about safety are addressed through existing licensing processes when there is evidence that a caregiver's actions, responses, or home environment may place a child at danger or risk. Holding or respectfully expressing personal, religious, or moral beliefs alone does not constitute a licensing concern.

### 3. Limitations belong in the placement matching process.
Applicants may identify comfort levels, preferences, or areas where they feel less prepared. These do not affect licensure. Instead, they help guide later placement decisions, which consider the needs and identities of actual children and youth—not hypothetical situations. Consistent with Division practice, placement decision-making begins with family finding and exploration of kin and fictive kin resources and continues throughout an open case, regardless of current placement, to promote permanency and

VERMONT
**DEPARTMENT FOR CHILDREN & FAMILIES**
**FAMILY SERVICES DIVISION**

**State of Vermont Agency of Human Services**
**Department for Children and Families**
**Family Services Division**

lifelong family connections. Matching is an ongoing process, and a caregiver's strengths, preferences, and limitations are revisited to ensure the best possible fit for each youth. Licensure establishes whether a home is safe; matching supports whether a particular home is the right fit for a specific youth at a specific time.

**4. Caregivers vary in experience, comfort, and readiness—and that is expected.**
Adults naturally differ in their familiarity with identities, cultures, or experiences that may be new to them. Because licensing decisions rely on information gathered during the time-limited applicant interview and site evaluation, the goal is to understand where applicants are beginning—not to anticipate future behaviors or evaluate viewpoints. The information gathered helps guide conversations, not predict or assume caregiver actions. Information gathered is used to guide supportive conversations and placement planning, not to presume future misconduct.

**5. Licensing evaluates behavior, not viewpoints.**
On behalf of the Department and Division, RLSI requires caregivers to maintain a safe, stable, and non-discriminatory home. The foster care application process does not require applicants to adopt, express, or endorse specific beliefs, viewpoints, or language as a condition of approval. This approach honors both child safety and caregiver autonomy while ensuring regulatory compliance.

Applicants' sincerely held personal, cultural, religious, moral, or philosophical beliefs shall not be considered in the licensing process. Applicants shall not be excluded based on any such beliefs nor on an intent to live, parent, and make day-to-day caregiving decisions consistent with those beliefs, so long as required standards of safety, care, non-discrimination, and respect for a child's safety, well-being, and dignity are met.

Licensing decisions are based on observable caregiving behaviors and demonstrated capacity to meet required standards in practice. In evaluating applications, the Division distinguishes between:

- Beliefs or viewpoints, which are not evaluated for licensure;
- Respectful, age-appropriate, and non-coercive communication, which is permitted; and
- Behaviors that cause harm, coercion, exclusion, or discrimination, which are not permitted and may affect licensure.

An applicant's statements of belief or personal conviction during the licensing process may not, by themselves, constitute evidence of risk, harm, or noncompliance.

## Core Behavioral Expectation

Caregivers must provide a safe home free from rejection, shaming, or discriminatory behavior. This includes the ability to:



**DEPARTMENT FOR CHILDREN & FAMILIES**
**FAMILY SERVICES DIVISION**

State of Vermont Agency of Human Services
Department for Children and Families
Family Services Division

- respond to children and youth in ways that do not cause physical, emotional, or psychological harm
- maintain an environment where youth feel safe expressing themselves
- refrain from behaviors that ridicule, demean, or isolate a youth
- partner with DCF and providers to ensure youth needs are met
- support the youth's hobbies, interests, and passions
- support youth in accessing school or community activities that promote safety and belonging

## Children & Youth's Rights Framework

Children and youth must always be at the center of the Division's work. While this is not an exhaustive list below, caregivers must uphold the rights of children and youth in foster care, including the right to:

- have their identity, culture, religious, moral, and philosophical beliefs, and lived experiences understood and respected in placement
- maintain meaningful connections with family, kin, and community supports
- participate in decisions about who they live with and what type of caregiver or home environment feels safe
- have their voice and perspective meaningfully included and elevated in case planning and decision-making
- express their personality and identity through clothing, hairstyle, cultural practice, or other forms of self-expression
- be free from shaming, punishment, coercion, or attempts to change who they are
- access supportive environments (e.g., school groups, counseling, peer supports)
- partake in or decline participation in religious activities without consequences, discipline, or retaliation
- experience safety, dignity, and nondiscrimination in their home

These expectations establish the minimum standard of care required for every licensed home and reflect Vermont's responsibility to protect children – not to impose a particular viewpoint on caregivers. A caregiver's failure to use particular language or adopt certain beliefs does not itself violate these rights.

## Areas RLSI Evaluates and May Explore Through Conversation

RLSI staff may use open-ended, neutral questions to understand:
- the caregiver's comfort supporting youth with diverse identities
- how the caregiver responds when a youth shares something personal or unfamiliar
- their typical approach to providing stability, belonging, and emotional support
- areas where additional training or information may be helpful

These conversations occur during the licensing phase to understand general caregiving capacity. They are not used to determine placement suitability for any specific child, which is addressed separately through the placement matching process.

VERMONT
DEPARTMENT FOR CHILDREN & FAMILIES
FAMILY SERVICES DIVISION

**State of Vermont Agency of Human Services**
**Department for Children and Families**
**Family Services Division**

As part of these conversations, RLSI will explain the regulations caregivers must follow, what types of actions could violate those regulations, and the potential consequences. This supports informed caregiving and clear expectations.

At the same time, RLSI does not assume that an applicant will engage in prohibited conduct simply because of their stated beliefs, values, or identified limitations. Conversations focus on actual caregiving behavior, not possible future violations.

## What RLSI Does Not Evaluate

Licensing does not require:
- endorsement or affirmation of specific identities
- agreement with certain viewpoints
- changes to personal, cultural, religious, moral, or philosophical beliefs
- use of particular vocabulary, prescribed language, or preferred pronouns related to gender identity, sexual orientation, or identity expression
- answers to certain hypothetical ideological or future-speech scenarios
- discussion of medical decisions that caregivers cannot independently make[1]
- agreement to facilitate medical appointments or procedures related to gender affirming care
- personal agreement with, or adoption of, specific terminology, identity frameworks, or expressive practices as a condition of licensure, so long as the caregiver's conduct remains respectful, non-coercive, and consistent with safety requirements.

## Placement Matching Considerations

Placement matching is guided by the young person's needs, voice, and sense of belonging. Matching decisions consider:
- the youth's identity, lived experience, and expressed preferences
- their need for a placement where they feel safe, respected, and able to be themselves
- the importance of cultural, familial, and community connections
- the caregiver's strengths, caregiving style, and willingness to learn or seek support
- any limitations that may affect a youth's experience in the home

Expressing limitations or preferences around caring for children and youth with diverse identities,

---

[1] When a young person is in DCF custody, caregivers are provided with the Division's Caregiver Authorization Letter. This letter permits caregivers to obtain routine and emergency medical treatment for the child. Caregivers are not the legal medical decision-makers for children in DCF custody. Medical decision-making authority remains with the Department, in consultation with the young person (as age- and developmentally appropriate), medical providers, and parents.



**VERMONT**
**DEPARTMENT FOR CHILDREN & FAMILIES**
**FAMILY SERVICES DIVISION**

State of Vermont Agency of Human Services
Department for Children and Families
Family Services Division

experiences, or needs—including preferences related to age, behaviors, medical, developmental, or mental health needs, or LGBTQ+ identity—is not inherently discriminatory. These are normal considerations that belong in matching, not licensing. This approach allows caregivers to voluntarily identify the populations they feel most prepared and equipped to support.

**Belonging matters.** Children and youth experience better outcomes when placed with caregivers who can support their identity, culture, and expression—whether related to race, ethnicity, religion, sexual orientation, gender identity, disability, trauma history, or other lived experiences. Caregivers do not need specialized expertise; they need the ability to create a safe environment and a willingness to learn.

**Matching is not about ideology; it is about fit.** A caregiver's stated preferences or limitations—including those related to caring for LGBTQ+ youth—help the Division identify the best possible match between a youth's needs and a caregiver's strengths and readiness.

**Youth voice matters.** Young people may express their preferences regarding placement, identity, connections, and other personal experiences when they feel ready to do so. Youth engagement is central to identifying supportive placements.

Because some youth may not yet be aware of, or ready to share, aspects of their identity, background, trauma history, needs, or other sensitive experiences when entering care, regular contacts by Family Services Workers, attorneys, and GALs serve as important safeguards to ensure youth safety and emotional well-being.

The Division works to ensure that each youth is matched with caregivers who can safely and confidently meet their needs. Youth also have the right to request consultation with the Commissioner's Committee on LGBTQ Issues if they feel unsafe, unsupported, or discriminated against.

## Discussion Prompts

The questions below are examples of prompts that may be used to support open, relational conversation. They are not exhaustive, nor is each question required in every discussion.

- "Tell me about your experience supporting young people whose identities or experiences are different from your own."
- "How comfortable do you feel supporting a young person who identifies as LGBTQ+?"
- "When a youth shares something important about themselves, what does support look like in your home?"
- "How do you create an environment where youth feel safe talking about what is happening in their lives?"
- "Youth sometimes share things that surprise adults. How do you typically respond?"
- "If a young person expressed something personal about their identity or came out to you, how would you respond?"



**DEPARTMENT FOR CHILDREN & FAMILIES**
**FAMILY SERVICES DIVISION**

State of Vermont Agency of Human Services
Department for Children and Families
Family Services Division

- "Are there areas where you would like more information or support to feel prepared for different types of placements?"
- "When a youth raises questions or experiences that feel new, what helps you learn or find guidance?"
- "It's completely normal to have areas where you feel more or less confident. Are there particular placement situations where you feel you'd be a strong fit—or not the best fit?"
- "Are there any preferences or limitations you'd like us to keep in mind for matching?"

## Conclusion

This practice guidance is an early step in strengthening how we engage applicants, understand caregiving capacity, and support thoughtful placement matching. It will continue to grow and evolve as we learn from staff, caregivers, youth, partners, and ongoing implementation efforts. Updates to the Foster Care Application and Renewal Application, along with development of a companion matching tool for district staff are also in development, which will help bridge the licensing and placement phases to ensure alignment with the Division's broader matching philosophy.



DEPARTMENT FOR CHILDREN & FAMILIES
FAMILY SERVICES DIVISION

# Attachment 2

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

MELINDA ANTONUCCI,
CASEY MATHIEU,
        Plaintiffs,

    vs.

CHRISTOPHER WINTERS, et. al,
        Defendants.

Case No. 2:24-CV-783

**JOINT STIPULATION AND FINAL JUDGMENT ORDER**

Plaintiffs Melinda Antonucci and Casey Mathieu ("Plaintiffs") and Defendants Sandi Hoffman, in her personal and official capacity as Interim Commissioner of the Vermont Department for Children and Families; Aryka Radke, in her personal and official capacity as Deputy Commissioner, Vermont Department for Children and Families, Family Services Division; Stacey Edmunds, in her personal and official capacity as Director, Residential Licensing & Special Investigations, Vermont Department for Children and Families; and Paula Catherine, in her personal and official capacity as a Licensing Officer, Residential Licensing & Special Investigations, Vermont Department for Children and Families ("Defendants"), by and through their undersigned counsel, hereby stipulate and agree to the entry of this Final Judgment.

Plaintiffs commenced this action pursuant to 42 U.S.C. § 1983 alleging that the Vermont Department for Children and Families' foster care licensing determinations and related policies and practices violated their constitutional rights. Defendants deny any violation of law. On February 18, 2026, DCF issued a new Practice Guidance document ending the challenged policies and practices. Ex. A. Under this Practice Guidance, DCF has agreed to rescind the previous

1

revocation decisions and reinstate Plaintiffs' foster care licenses. The parties now jointly move to enter a stipulated order and final judgment in this case.

The Court, having jurisdiction over the parties and the subject matter of this action, and consistent with the Parties' agreed-to resolution of this matter, hereby enters the following Final Judgment.

IT IS HEREBY ORDERED:

1. Defendants shall reinstate Plaintiffs' foster care license to the same status, terms, conditions, and scope that existed immediately prior to its revocation or non-renewal. Reinstatement shall occur within the time agreed to in the Parties' settlement agreement.

2. Defendants represent that the Practice Guidance entitled "Supporting Conversations with Foster Care Applicants About Caring for LGBTQ+ Youth" (Ex. A) has been adopted in the form agreed to by the parties and governs foster care licensing determinations statewide. Defendants shall apply that Guidance in their evaluation of Plaintiffs.

3. In evaluating Plaintiffs' eligibility for foster care licensure or renewal, Defendants shall not:

   a. consider Plaintiffs' protected speech, religious beliefs, or viewpoints regarding sexual orientation, gender identity, or related issues as a basis for licensure or renewal determinations;

   b. condition licensure or renewal determinations on Plaintiffs' affirmation, endorsement, or adoption of any particular ideological or value-based positions regarding sexual orientation or gender identity;

   c. require Plaintiffs to engage in ideological or value-laden speech as a condition of foster care licensure or renewal.

2

4.      Defendants agree that the Practice Guidance shall govern considerations related to LGBTQ+ youth in Plaintiffs' foster parent licensure and licensing determinations. Policy 76 shall remain in effect solely as an internal policy applicable to Department staff and shall not be used, referenced, or relied upon in any manner in licensing determinations, investigations, or evaluations of foster parents or foster parent license applicants. Policy 76 shall not be applied in evaluating Plaintiffs' eligibility for foster care licensure.

5.      Defendants shall not take adverse licensing action against Plaintiffs in retaliation for Plaintiffs' participation in this action or assertion of constitutional rights.

6.      This Final Judgment resolves all claims asserted in this action.

7.      Each party shall bear their own costs and fees.

8.      The Court retains jurisdiction solely for the purpose of enforcing this Final Judgment.


APPROVED and SO ORDERED:


Date: _____        _____

                                               Judge William K. Sessions III

3